Table of Contents

**Introduction**................................................................ ..................1

**Procedural History**............................................................2

**Statement of Facts**........................................... .....................5

    Facts in evidence at trial.........................................................5

        *Inconsistencies in Perez's identification*....................................8

        *Cross-examination of Perez regarding his medical records*.....................9

    Facts adduced post-trial.............................................................10

        *Perez's mental health records*..................................................11

        *Identification expert*...........................................................13

        *Physics and ballistics experts*..................................................14

        *Trial counsel's testimony*.......................................................16

**Standard of review**............................................ .......................17

**Argument**................................................... ...................................21

I.    THE STATE COURT DECISION ON THE INEFFECTIVE ASSISTANCE OF COUNSEL
       ISSUE WAS CONTRARY TO AND INVOLVED AN UNREASONABLE APPLICATION OF
       CLEARLY ESTABLISHED FEDERAL LAW AS DETERMINED BY THE SUPREME COURT
       IN *STRICKLAND V. WASHINGTON*, AND IT WAS BASED ON MULTIPLE
       UNREASONABLE DETERMINATIONS OF FACTS IN LIGHT OF THE EVIDENCE
       PRESENTED. ...........................................................................21

       A.    THE SJC MADE MULTIPLE UNREASONABLE DETERMINATIONS OF FACTS
           IN LIGHT OF THE EVIDENCE PRESENTED...................................22

           1.    Counsel's failure to notice that he had not received the
                psychological records of the Commonwealth's sole witness........22

                *PTSD*................................................................23

*Marijuana addiction*..................................................................24

*Effect of mental health issues and marijuana addition on witness's perception*..................................................................................25

*The effect of counsel's not having the psychology records is exacerbated by the lack of an expert to explain them to the jury*......................................................................................28

2.   Counsel's failure to retain an expert on eyewitness identification .......31

3.   Counsel's failure to retain a ballistics expert .........................................33

B.   THE STATE COURT DECISION ON THE INEFFECTIVE ASSISTANCE OF COUNSEL ISSUE WAS CONTRARY TO AND INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS DETERMINED BY THE SUPREME COURT IN *STRICKLAND V. WASHINGTON*.......................................................................34

1.   Counsel's failure to notice that he had not received the psychological records of the Commonwealth's sole witness...........................................36

2.   Counsel's failure to retain an expert on eyewitness identification........38

3.   Counsel's failure to retain a ballistics expert.........................................39

4.   Conclusion: The totality of the omitted evidence....................................40

II.   THE STATE COURT DECISION ON THE INSUFFICIENCY OF EVIDENCE WAS CONTRARY TO AND INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS DETERMINED BY THE SUPREME COURT IN *JACKSON V. VIRGINIA*, AND IT WAS BASED ON MULTIPLE UNREASONABLE DETERMINATIONS OF FACTS IN LIGHT OF THE EVIDENCE PRESENTED............41

*Factual background*..................................................................................41

*Unreasonable determinations of facts in light of the evidence presented*..........42

*Unreasonable application of federal law*.............................................................45

III.   THE STATE COURT DECISION ON THE DENIAL OF ACCESS TO EVIDENCE REGARDING A WITNESS WHO WAS A CONFIDENTIAL INFORMANT WAS CONTRARY TO AND INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED

FEDERAL LAW AS DETERMINED BY THE SUPREME COURT IN *WASHINGTON V. TEXAS*, AND IT WAS BASED ON MULTIPLE UNREASONABLE DETERMINATIONS OF FACTS IN LIGHT OF THE EVIDENCE PRESENTED. ...............................................46

*Factual background with respect to witness N.F.*..............................................47

    N.F.'s deposition................................................................................47

    N.F.'s different trial testimony...............................................49

    N.F.'s affidavit..................................................................50

    Procedural background of defense efforts.............................52

*Unreasonable determinations of facts in light of the evidence presented*..........53

*Unreasonable application of federal law*............................................................55

    Sixth Amendment right to compulsory process......................................55

    Commonwealth's duty to remedy false impression...............................57

**Conclusion**.......................................................................................................59

**Certificate of Service**......................................................................................59

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Docket Number 3:20-cv-30059-MGM

Phillip Ayala,                    )
            Petitioner             )
                                   )    Memorandum in Support of Petition
            v.                     )    for Writ of Habeas Corpus
                                   )
Sean Medeiros,                     )
            Respondent             )

## Introduction

The testimony of Robert Perez was the only evidence in this case that linked Phillip Ayala to the murder of Clive Ramkissoon.  There was no physical evidence to connect Ayala to the shooting, and no other witnesses testified to seeing him shoot Ramkissoon.  Nor was there evidence of any connection between Ayala and Ramkissoon, witness Perez, or the woman with them.  The shooting occurred in a public area where there were many people who had access and an opportunity to commit the crime. There was no evidence of any threats, hostility, or other type of relationship between Ayala and the victim, and there was no evidence of any prior contact between Ayala and the victim.

In Perez's identification testimony, he retreated from almost every statement he made to the police after the shooting so that his description by the time of trial matched Ayala.  Consciously or not, Perez had decided that Ayala must be the

1

shooter, and Perez adjusted the facts to fit Ayala.

Each of the Petitioner's claims of ineffective assistance of counsel involve evidence that have contradicted or called into question Perez's credibility and the reliability of his identification.  The claims include:

- that counsel had failed to notice that he did not receive Perez's psychological records of his marijuana addiction and his post-traumatic stress disorder ["PTSD"], and so he had not retained a psychologist to explain how those mental health disorders affected Perez's ability to perceive and recall.

- that he should have called experts to testify to the impossibility of Perez's identification of Ayala from the light of the muzzle flash of a .22 caliber pistol, as Perez claimed;

- that he should have called an identification expert to testify about the concept of transference and the possibility that Perez, who had been anxious prior to even entering the party, identified Ayala as the shooter precisely because he had become concerned about Ayala's intentions during the altercation at the party, and not because Ayala had actually been the shooter.

The Supreme Judicial Court's ["SJC"] decision was based on multiple unreasonable determinations of facts in light of the evidence, and it was an unreasable application of *Jackson v. Virginia* in its decision on the sufficiency of evidence and of *Washington v. Texas* in its denial of Ayala's right to compulsory process.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979);  *Washington v. Texas*, 388 U.S. 14, 19 (1967).

## Procedural History

On July 10, 2007, Ayala was indicted on charges of murder and unlawful possession of a firearm and ammunition.  On August 12, 2009, prior to trial, defense

2

counsel moved to examine medical and psychological records of Robert Perez, the government's sole eyewitness, from the Veteran's Administration hospital in Leeds, Massachusetts (V.A.).  The motion was allowed and on August 13, 2009, an order was entered to the V.A.   But, contrary to the judge's ruling, the August 13, 2009 order was for medical records only, and expressly excluded psychological records.  August 14, 2009, a second order was issued to the V.A.  The second order was for both medical and psychological records.

Trial commenced on August 13, 2009 before a jury, Velis, J., presiding.  On August 17, 2009, the Clerk's Office received Perez's V.A. medical records, but not his psychological records.

On August 25, 2009, a jury found Ayala guilty of both counts.  He was sentenced to life imprisonment without possibility of parole.

Represented by new counsel, Ayala filed a Motion for New Trial in the Supreme Judicial Court on February 10, 2011.  The appeal was stayed, and the Motion was remanded to Hampden Superior Court and referred to the trial judge. The Petitioner filed motions for Post-Conviction Discovery of Exculpatory Evidence, a Motion to Amend his Motion for New Trial, and a Second Motion to Amend his New Trial.  The Petitioner also filed a Motion for the Funds for Expert Witnesses, and a Second Motion for the Funds for Expert Witnesses.  All of these motions were allowed by Judge Velis.

On September 14, 2012, Judge Velis found that a substantial showing had been made and ordered an evidentiary hearing on the following matters: failure to

3

investigate potentially exculpatory eyewitness testimony; failure to sufficiently explore potential flaws in the Commonwealth's firearms expert's conclusions; and failure to investigate or explore at trial potentially significant flaws in the sole percipient witness's identification testimony.

Prior to the evidentiary hearing, Judge Velis retired in November of 2012. Shortly thereafter, post-conviction counsel withdrew.  Successor post-conviction counsel discovered that the eyewitness's records received from the V.A. before Ayala was convicted did not include Perez's psychological records.  Counsel contacted the V.A., provided the V.A. with a copy of the August 14, 2009 summons, and requested the psychological records be sent to the court.

On November 17, 2014, Ayala filed a Further Amended Motion for New Trial and Request for Evidentiary Hearing.  The Court (Kinder, J.) denied the motion for an evidentiary hearing as to the claim that trial counsel was ineffective for failing to notice the absence of the psychological records.  Judge Kinder allowed a hearing on issues already ruled on by Judge Velis.

On November 20, 2015, after a three-day evidentiary hearing, the Court filed a Memorandum and Order denying the Petitioner's motion for new trial.  Ayala filed a timely notice of appeal on November 27, 2015.

On December 6, 2018, the Supreme Judicial Court upheld the denial of Ayala's motion for new trial and affirmed his convictions.  On December 17, 2018, Ayala filed a Petition for Rehearing in the SJC.  On January 24, 2019, the Petitioner's Petition was denied.

4

## Statement of Facts

### Evidence at Trial

On June 10, 2007, victim Clive Ramkissoon and witness Perez had been watching a fight on TV at Perez's apartment, and then the two went to a bar in Springfield. As they were coming back, they met Quadisha Sims, and the three drove together to an after-hours party. As they were driving up Wilbraham Road, Perez said that area "was not the best area as far as crime goes" and they should not go there for a party. Tr. 8/18/2009: 79.2. Sims said that a young girl had been shot in the area three weeks earlier. Tr. 8/18/2009:79. But Sims said that they would be fine and that she would introduce Ramkissoon and Perez as her cousins. Tr. 8/18/2009: 79. The three arrived at the party shortly before 2:00 a.m. Tr. 8/19/2009:25.

The party house on the corner of Wilbraham Road and Colonial was commonly the scene of after-hours parties, and that night there were three bouncers working the party. Tr. 8/17/2009: 85. Equilla Haines was the bouncer stationed at the door searching people as they entered the first floor, and two other bouncers were stationed upstairs where the party was. Tr. 8/19/2009: 137-39. The party also had a paid disk jockey, NT.[1] Tr. 8/19/2009: 146; 8/20/2009: 130. According to bouncer Haines, there was "Alcohol – the party had everything that you can imagine." Tr. 8/19/2009: 146. That night there were between twenty and fifty people at the party. Tr. 8/17/2009; 102; Tr. 8/18/2009: 85; Tr.8/20/2009 (144)

---

[1] For reasons that will become apparent in Section III, the DJ will be referred to as NT.

5

Upon arrival, Ramkissoon, Perez, and Sims were frisked downstairs by bouncer Haines.  Upstairs, Ramkissoon paid a five-dollar fee for each of them, and Ramkissoon bought beers for himself and Perez.  Perez went back downstairs and talked to Haines while she was frisking people.  While Perez was standing on the stairs, he noticed a man [Philip Ayala] come in who did not want to pay or be frisked.  Tr. 8/19/2009.  The man pushed past Haines and Perez, who was standing in the middle of the stairs.  Tr. 8/19/2009: 35.  Perez noticed that the bouncer at the top of the stairs would not let the man into the party without being pat frisked.  Tr. 8/19/2009: 37.  The two upstairs bouncers escorted the man back down the stairs and outside, "I took notice again of the person that I now know as Mr. Ayala's face." Tr. 8/19/2009: 36.  Perez testified that the man was upset and as he was being escorted outside, and Perez heard the man say "I'll come back and I'll light this place up."  Tr. 8/19/2009: 83.  Perez had never seen the man before those "couple of minutes" that night in the stairwell.  Tr. 8/19/2009: 35.  The front door to the party was then closed.  A short time later Perez heard a loud bang.  Tr. 8/19/2009:39. Bouncer Haines saw the man who had been escorted outside kick in the door.  Tr. 8/19/2009: 145

Perez recalled that seconds after the door was kicked in, and, based on what was said earlier about "I'll light this party up," he [Perez] went upstairs to get Ramkissoon. Tr. 8/19/2009:38, 39.  Perez and Ramkissoon went outside onto the porch to "assess the situation."  Tr. 8/19/2009: 39.  They observed the man who had been escorted out, wearing a white T-shirt and matching shorts, walking on the

6

street.  Tr. 8/19/2009: 34.  When asked how he identified Ayala, Perez was confident

that he recognized the man based on his face.  Tr. 8/19/2009: 34.  When they saw

the man walking outside they decided to wait a little while before leaving.  Tr.

8/19/2009: 39.  When the man was out of view, they decided to leave.  Tr. 8/18/2009:

84, 86.  When he and Ramkissoon came back inside, Sims was having an argument

with the bouncer who was kicking her out of the party for dancing provocatively.

Tr. 8/19/2009: 39.

The three left the party, and Sims began dancing in the middle of the road in

front of 336 Wilbraham Road in front of a car.  Tr. 8/18/2009: 85,88: Tr. 8/19/2009:

42, 43.  Ramkissoon, who had been ahead of Sims and Perez, was walking towards

Bristol Street where the car was parked.  Tr. 8/18/2009: 88.

Perez turned towards Sims and tried to escort her to the other side of the

road when he heard gunshots.  Tr. 8/18/2009: 85, 88, Tr. 8/19/2009: 44.  Perez

testified that before hearing the shots, he saw a muzzle flash coming from the

sidewalk area, near the lamp-post in front of 338 Wilbraham Road.[2]  Tr.

8/19/2009:45, 46.  A photograph of the lamp-post shows that the post is on the grass

near the curb, and the lamp is on a curved arm that extends out over the street.  A.

203.  Perez did not know whether the streetlights were on.  Tr. 8/19/2009: 93/, 95.

The muzzle flash, Perez said, "illuminated" the shooter's face, allowing him to

identify the shooter as the person he had seen on the staircase.  Tr. 8/19/2009:

---

[2] The flash and the sound would have been simultaneous.  Tr. 11/2/15: 29.

48-50.  Specifically, Perez testified: "When the muzzle flash went off, I was already pointed in that area.  It illuminated Mr. Ayala's face." Tr. 8/19/2009: 48. (emphasis added.)

Perez recalled hearing five to seven shots.  Tr. 8/19/2009: 45, 49.  After two or three shots, which occurred in a matter of seconds, he started running.  Tr. 8/19/2009: 48-50.  Perez jumped over a fence, ran through a parking lot of the church across the street from the party house, and never looked back.  Tr. 8/19/2009: 50.  He came out onto Bristol Street where he saw Ramkissoon lying face down on the sidewalk.  Tr. 8/19/2009: 51.  Ramkissoon was unconscious and had vomit coming out of his mouth.  Tr. 8/17/2009: 89, Tr. 8/18/2009: 91.  Police arrived at 2:52 a.m. and transported Ramkissoon to the hospital, where he died of his injuries.

*Inconsistencies in Perez's identification*

At the trial, Perez acknowledged that he told the police that the shooter was 6' to 6'1," but he had changed that opinion as to the shooter's height.  Tr. 8/19/2009: 56, 57.  He denied that this change was because someone had told him Ayala was nowhere near 6' to 6'1".  Tr. 8/19/2009: 56.  He explained the change of testimony because, he said, he had viewed Ayala on the staircase and so could not properly estimate his height.  Tr. 8/19/2009: 57.

In the description that he gave the police that night, Perez said Ayala was wearing a matching coat and pants set.  Tr. 8/19/2009: 68; S.A.II/452.  By the time

8

of trial, he had changed that description and said Ayala was wearing "a white

T-shirt or green T-shirt with a kind of skull on it.  That's definitely what I recall

that he was wearing and also some shorts, but I don't recall the color." Tr.

8/19/2009: 58.  As Perez acknowledged, his description of Ayala's clothes now

matched the clothing Ayala happened to be wearing during his arraignment.  Tr.

8/19/2009: 93.

At about 3:30 that morning, Perez went to the police station where the police

showed him a photo array and Perez positively identified one of the pictures, a

photo of Philip Ayala, as the person who did not want to be frisked by the bouncers

and who shot his friend.  Tr. 8/19/2009:61, 62,63.


*Cross-examination of Perez regarding his medical records*[3]

In 2000, Perez was discharged from the army and began using the services of

the Veterans Administration to treat his Post Traumatic Stress Disorder ["PTSD"].

He continued treatment of this disorder from 2000 through and up to the time of

Ayala's trial.  Perez also testified that he learned he had been diagnosed with

borderline personality and bipolar disorder, but did not learn about this until after

the shooting, in about October, 2007.  Tr. 8/19/2009: 17.  Defense counsel showed

Perez a list of V.A. appointments which indicated that Perez had seen

Drs. Lenchitz and Cabaero 161 times between 2000 and 2007, and that he had seen

---

[3] As set forth in Section IA, defense counsel had Perez's medical records
available to him, but not his mental health records.

Dr. Lenchitz on June 11, 2007, the day after the murder.  Tr. 8/19/2009: 9-11, 13,

17, 19; S.A.II/008-012.  When asked directly about the effect PTSD had on him,

Perez testified: "My PTSD does not affect me person – my military PTSD was under

control.  While I was going to counseling I was working, I was being productive.

And so the effect that it had on me was minimal.  It's just basically, in an essence,

remembering a bad time, a bad dream, a bad situation, and I was already past that

point.  I had gone through my counseling, I had done the steps that I needed to do to

get myself better."  8/19/2009: 12.

When asked whether he had ever self-medicated, Perez testified that "there

were times when I've used marijuana." 8/19/2009: 19.  When asked why he used

marijuana he testified: "I used marijuana whenever I would have a night terror and

I was unable to sleep." Tr. 8/19/2009: 19-20.


Facts Adduced Post-trial

After conviction and represented by new counsel, Ayala filed a motion for

new trial.  Evidence presented to the motion court included the psychological

records of Perez's treatment for PTSD, bi-polar disorder and marijuana dependence.

11/2/2015: 16.  An affidavit from Dr. Jose Hidalgo, an expert who had reviewed the

records, was submitted with the motion for new trial.  Additionally, affidavits from

trial counsel and three additional experts who did testify at the hearing, were

submitted into evidence. 10/22/2015: 12; 23; 85; 10/27/2015: 75; 95; 11/2/2015: 18.

*Perez's mental health records*

The psychological records trial counsel failed to notice he had not received were entered into evidence at the motion hearing. Among the records was a note dated June 11, 2007, detailing a visit Perez made to his psychologist the day after the shooting. It reads, in full:

Walk in – emergency – I had to talk to you – Saturday night we watched the fight and then we went to a strip club – going home we met someone – a girl –than an after-hours party – he had been drinking and I only had two beers all night – I use marijuana – he was shot three times –he was laying in the street – I started to get out – his teeth were shattered – like mine in Germany –I tried to call the police – my cell phone was dead – I flagged down a car – the cops took forever to come – I'm angry – I am the primary witness and I identified the shooter – my friend was 32 –they said it was gang related – it was random – I feel guilt I wanted to be able to save him – I can't go to work today – I don't want medication –am I paranoid? I want to get a gun –the girl wouldn't identify him. The police gave me their phone numbers – I really can't have a gun – I have a felony – what would you do? I haven't seen my son – shirt tie tearful at times – borderline – several issues – self-protection, guilt – some flashbacks to an incident in Germany – he knows he cannot get a gun without severe consequences – confused – adjustment disorder – 50 minutes – suggested the focus be his friends family members and after that return for another appointment to discuss other options – p.r.n. –

S.A. II/170.

These psychological records also detail Perez's long history of marijuana abuse, stretching back over seven years time. The records show Perez tried to quit several times but could not, even when it was causing him problems with probation. One note indicates he smoked up to 3 and one-half grams a day costing him about $200 a week, and quoted him as saying "I can't give it up." S.A. II/170. About 5 months before the shooting (his last visit prior to the shooting), he told his doctors he didn't think he'd ever be able to stop taking marijuana. S.A. II/171.

Additionally, in the notes from Perez's visit to the doctor the day after the shooting he indicated the Ramkissoon "had been drinking and I only had two beers all night – I use marijuana." S.A. II/170.

In his affidavit, Dr. Hidalgo reviewed Perez's medical and psychological records, and he opined that at the time of the shooting, Perez suffered from Borderline Personality Disorder, marijuana use disorder and symptoms from post-traumatic stress disorder, and these problems had the capacity to and may have interfered with Perez's ability to accurately perceive or recollect the events of the shooting.  S.A.II/312, 316.  In particular, Dr. Hidalgo opined that Perez "was suffering from post-traumatic stress symptoms prior to, during, and after the incident of June 10, 2007.  S.A.II/315.  Dr. Hildago stated that Perez's long history of heavy marijuana use "can reduce the ability to accurately perceive and recall past events, and both borderline personality disorder and posttraumatic stress involve difficulty regulating emotions and dealing with stress.  S.A.II/316.

Dr. Hidalgo opined that the shooting incident "appears to have overwhelmed Mr. Perez's already fragile emotional coping capacities."  S.A.II/316.  He went on to state: "Re-experiencing a traumatic event in the form of flashbacks and/or memories increases the level of emotional reactivity and can affect perception of reality and memory."  S.A.II/316.  According to Dr. Hildago, any one of the aforementioned issues may interfere with memory and recall.  It was Dr. Hildago's opinion, based on the evidence, that Perez's "perception of reality and recall" may have been negatively affected.  S.A.II/316.  Finally, Dr. Hildago stated that if called to testify

12

in 2009 after reviewing the same materials, his opinions would have been substantially the same.  S.A.II/316.

*Identification expert*

Dr. Samuel Sommers, an associate professor of psychology at Tufts University, testified as an expert in eyewitness identification and memory. Tr. 10/22/15: 76.   First, Dr. Sommers explained that "memory is not a videotape." 10/22/15: 87.  Instead, "memory functions as a constructive process" that occurs in three stages: "[t]here is encoding, there is storage, there is retrieval.  Tr. 10/22/15: 87-89.  Encoding is the actual experience and perception of what is happening.  We then store parts of that information.  Retrieval is the process of trying to recall the memory in order to think about it or convey it to someone else. "And so all of those chains during the course of memory – memory functions as a constructive process not a pristine videotape, but information that we learn or other influences at any of those points in time can have a way of affecting the actual memory itself."  Tr. 10/22/15: 88-89, emphasis added.

According Dr. Sommers, under high stress, the accuracy of witness identification tends to decline. Tr. 10/22/15: 84.  Shorter encoding periods, or time during which the witness actually saw the action or person to be remembered, are associated with worse memory performance.  Tr. 10/22/15: 86.  Post-event information, "has a way of contaminating our original memories to the point where we can't differentiate what we actually saw versus what we now think we saw from

information we later learned." Tr. 10/22/15: 87-88.  For instance, being told by an investigator that you have chosen the right subject can influence memory.  Tr. 10/22/15: 90.  Also, where a witness has been focused on a particular person before the incident in question, the witness may identify that person as the perpetrator when the reality is that person is someone the witness remembers from the earlier instance.  This phenomenon is known as transference.  Tr. 10/27/2015: 36-37.

Dr. Sommers testified that lay persons' – and jurors' – beliefs about how memory works tend to be wrong.  For instance, people tend to believe that seeing something under intense stress "burns a memory into the brain such that it becomes even stronger and more accurate" is untrue, and, in fact, highly stressed persons tend to have less accurate memories of those events. Tr. 10/22/15: 82-84. Jurors also tend to believe that the apparent confidence a person has in their identification is a strong indicator that the identification is accurate, when there is no correlation between confidence and accuracy. 10/22/15: 79-81.

:

*Physics and firearms experts*

Dr. Michael Courtney, a Ph.D. physicist and ballistics expert, testified that the muzzle flash from ammunition used in this shooting would last less than 30 milliseconds.  Tr. 10/22/15: 29.  Based on his experience and training and a number of experiments he performed, Dr. Courtney stated that within a reasonable degree of scientific certainty, a shooter's face cannot be identified in the muzzle flash from a .22 weapon of the type used in this case.  Tr. 10/22/2015: 22.  Dr. Courtney

14

testified that even the muzzle flashes from larger weapons, such as a .9 millimeter or a .40 caliber handgun, "don't illuminate the shooter's face so that it can be identified." Tr. 10/22/2015: 21. A high speed photo produced by Dr. Courtney using .22 LR ammunition shows no illumination on the shooter's face.  Tr. 10/22/2015: 26-27; .S.A. I/458.

Greg Danas, testified similarly.  He is a firearms expert for the federal defender's office in Boston, in charge of his own ballistics laboratory, and has been recognized as a ballistics expert in the courts of Massachusetts, Vermont and New York.  For this case, Danas performed a number of experiments.  These confirmed his own prior experience from witnessing approximately 900,000 rounds fired from .22 caliber weapons as an instructor at a gun school, which is that the "illumination [from the muzzle flash of a .22 caliber pistol] is insignificant" and lasts only between one-hundredth to four one hundredths of a second.  Tr. 11/2/15: 22, 32.  His experiments involved firing .22 caliber guns with varying barrel lengths and, in addition to watching himself from distances of between 9 and 40 feet from the barrel, recording the experiments on videotape.  None of the muzzle flashes illuminated the face of the shooter.  11/2/15: 32.  In all his years as an instructor, he had never seen muzzle flash illuminate a shooters face.  Tr. 11/2/2015: 22.  A DVD video prepared by Danas and videographer Christopher Fadale showed no illumination on the shooter's face from muzzle flash.  Tr. 11/2/2015: 24; A. 390.5. Both Dr. Courtney and Danas would have testified substantially to the same effect in 2009.  Tr. 11/2/2015: 33.

15

*Trial counsel's testimony*

Trial counsel provided an affidavit and testified at the motion hearing.  In his affidavit he averred:

At no time prior to or during trial did I consider consulting with or calling an eyewitness identification expert to testify in this case.  I did not attempt to identify any matter in which it would be important for an eyewitness ID expert to testify, and I did not consult with any such expert to explore possibilities.  I did not discuss the matter with my client or with anyone else.  The contested issues needing to be resolved by the jury in this case were fact issues that typically were resolved by jurors without expert testimony.  There was no strategic decision on my part that consulting with or calling an expert on eyewitness identification issues might be contrary to my client's interests.  I simply never considered it.

S.A.II/461.

At the motion for new trial hearing, counsel further testified that he never considers obtaining an expert in eyewitness identification, and had not done so in any of the forty-seven murder trials he had tried. Tr. 10/27/2015: 113. Counsel also testified that, in regard to not hiring an expert on eyewitness identification: "It was not a strategic decision. It was the fact that I was drawn to too many other tasks." Tr. 10/27/2015: 99.

In his affidavit, counsel wrote that he "considered Robert Perez' [sic] medical and mental health records from the Northampton V.A. Center in Leeds to be important for me – as defense counsel – to obtain and review prior to trial." S.A.II/459.  He went on to state: "However, given my focus on other aspects of trial preparation, I failed to notice that the records sent to the clerk's office contained only the medical records.  The mental health records were not sent.  When I recognized, mid-trial, that the mental health records were missing, I did not follow

16

up." S.A.II/459-60.  Counsel went on: "Not doing so was not a strategic decision.  I was busy and distracted by other issues.  The missing mental health records slid off my radar." S.A.460.  At the hearing, counsel testified that he had "no recollection as to what I actually did relative to the mental health records and examination …" Tr. 10/27/2015: 107.  "Other than trying to ascertain that I knew he had been at the VA, Mr. Perez, whether I really looked at the records, I have absolutely no present recollection.  I don't think I was able to." Tr. 10/27/2015: 107.

In his affidavit, trial counsel averred that he was "surprised at trial when Perez testified that he had identified Ayala as the shooter, not by his clothes, but by seeing his face in the illumination from the muzzle flash."  S.A. 460.  He also stated that his failure to request a continuance "in order to evaluate and have an opportunity to develop a rebuttal to the surprise testimony," was not a strategic decision.  S.A.II/460.  "I simply proceeded with the trial without considering the possible value of a continuance."  S.A.II/460.  At the motion hearing he testified that he did not consider hiring a ballistics expert until post-conviction counsel brought it to his attention. Tr.10/27/2015: 99.

Additional facts are discussed in the argument sections below.


**Standard of Review**

Because the Petitioner filed his Petition for Habeas Corpus after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of the Petitioner's claim is governed by that statute.  *Lindh v. Murphy*, 521

U.S. 320, 336 (1997); *see Niland v. Hall*, 280 F.3d 6, 11 (1st Cir. 2002); *Bui v. DiPaolo*, 170 F.3d 232, 235 (1st Cir. 1999)(AEDPA applies to petitions filed after April 24, 1996), *cert. denied,* 529 U.S. 1086 (2000).  AEDPA "places new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see Bell v. Cone*, 535 U.S. 685, 693 (2002)(AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under the law"); *Williams v. Matesanz*, 230 F.3d 421, 426 (1st Cir. 2000)("a federal [habeas] court operates within a closely circumscribed sphere").

AEDPA allows a federal court to grant habeas relief if the state court's adjudication of a claim "on the merits ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C. 2254 (d)(1), or was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. 2254(d)(2); *see Kibbe v. DuBois*, 269 F.3d 26, 33 (1st Cir. 2001), *cert. denied sub nom., Kibbe v. Maloney*, 535 U.S. 960 (2002); *Hurtado v. Tucker*, 245 F.3d 7, 15-16 (1st Cir.), *cert. denied*, 534 U.S. 925 (2001).

The phrase "clearly established federal law, as determined by the Supreme

Court of the United States" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision.  The statutory language makes clear that 2254(d)(1) restricts the source of clearly established law to Supreme Court jurisprudence. *Williams v. Taylor*, 529 U.S. at 412.  Writing for a majority in *Williams* relative to the proper construction of 2254(d)(l), Justice O'Connor's opinion gave independent meaning to both the "contrary to" and the "unreasonable application" clauses of the statute, and rejected the *de novo* analysis espoused by four members of the Court.  *Id.* at 404.

The Supreme Court has instructed that a state-court decision is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in" Supreme Court cases or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Id.* at 405-406; *see Mount Joy v. Warden, New Hampshire State Prison*, 245 F.3d 31, 35 (1ˢᵗ Cir. 2001), *cert. denied*, 535 U.S. 969 (2002); *Hurtado*, 245 F.3d at 15.

A state court decision constitutes an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. at 407-408; *see Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  In making this determination, a federal

habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor*, 529 U.S. at 411; *see Kibbe v. DuBois*, 269 F.3d at 36; *Hurtado v. Tucker*, 245 F.3d at 15-16; *Williams v. Matesanz*, 230 F.3d at 426-427.

There is no bright line rule as to what constitutes an "objectively unreasonable" application of federal law. *Williams v. Taylor*, 529 U.S. at 410 ("[t]he term 'unreasonable' is no doubt difficult to define".) However, as the *Williams* decision makes clear, an unreasonable state-court determination is not the equivalent of an incorrect one. *Id.* ("the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law"). Thus, it is settled that "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application [or determination] must also be unreasonable." *Id.* at 411; *see Mountjoy*, 245 F.3d at 35.

The First Circuit Court of Appeals has noted that the question of unreasonableness involves "'some increment of incorrectness beyond error' ... The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) (en banc), *quoting Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000). "If it is a close question

whether the state decision is in error, then the state decision cannot be an unreasonable application." *Id*.

Under 28 U. S. C. §2254(d)(2), a federal court may grant a state prisoner habeas relief if his claim was adjudicated on the merits in state court and "resulted in a decision … based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Under §2254(e)(1), "a determination of a factual issue made by a State court [is] presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."

These two alternative prongs – contrary to and an unreasonable application of Supreme Court precedent and an unreasonable determination of facts in light of the evidence – are presented below within each of the issues.

## Argument

I.   **THE STATE COURT DECISION ON THE INEFFECTIVE ASSISTANCE OF COUNSEL ISSUE WAS CONTRARY TO AND INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS DETERMINED BY THE SUPREME COURT IN *STRICKLAND V. WASHINGTON,* AND IT WAS BASED ON MULTIPLE UNREASONABLE DETERMINATIONS OF FACTS IN LIGHT OF THE EVIDENCE PRESENTED.**

The Sixth Amendment to the Constitution and article 12 of the Declaration of Rights guarantee Mr. Ayala the right to effective assistance of counsel. U.S. Const. amend. VI; *Cuyler v. Sullivan*, 446 U.S. 335, 343 (1980).  Counsel's many egregious missteps, failure, and lack of attention deprived Ayala of any defense whatsoever.

*Commonwealth v. Wright*, 411 Mass. 678, 682 (1992)(errors likely affected verdict).

A.   **THE SJC MADE MULTIPLE UNREASONABLE DETERMINATIONS OF FACTS IN LIGHT OF THE EVIDENCE PRESENTED.**

1.   Counsel's failure to notice that he had not received the psychological records of the Commonwealth's sole witness.

The Petitioner claimed on appeal that trial counsel's failure to notice that he had not received the psychological portion of Perez's V.A. records amounted to constitutionally ineffective assistance.  These records pertained to Perez's mental health, his diagnosis of PTSD, and his longstanding and heavy use of marijuana. The records also demonstrated that at the time of the shooting Perez was suffering from symptoms of a serious PTSD episode.

The Supreme Judicial Court ruled that trial counsel's failure to notice that he had not received the psychological portions of Perez's V.A. records was unlikely to have influenced the jury's verdict.  In doing so the Court agreed with the motion judge that "these issues were sufficiently before the jury, the additional records would not have 'added to the information already at [trial counsel's] disposal and used in cross-examination at trial."

There are two distinct findings here: (1) that Perez's mental health and his history of marijuana abuse were "sufficiently aired" at trial, and (2) that the additional records added no new information not already at trial counsel's disposal during trial.  These findings of fact are directly contradicted by the records themselves, records which had been entered into evidence at the Petitioner's Motion

22

for New Trial hearing. A simple comparison between the evidence at trial and the information contained in the missing records shows that the SJC's findings of fact were entirely unreasonable.

*PTSD*

At trial, Perez testified that the effects of PTSD on him were "minimal" and that he had done the work necessary to get better, leaving the jury with the impression that he was not suffering from the effects of PTSD on the night of the shooting. In contrast, the records discovered after trial include the note above which indicates that Perez was suffering from a serious PTSD episode on the night of the shooting.

It is difficult to understand how the SJC could find that this issue was sufficiently aired at trial, when the information contained in the new records was never heard at trial. The person who made an emergency visit to his psychologist the day after the shooting appears to be more than minimally effected by PTSD – his doctor indicates he appears anxious, he says he is angry, and tells the doctor he is having flashbacks of an injury he suffered while in the military. This information could have been used to counter Perez's claim that he was minimally affected by his PTSD.

The PTSD records also would have been relevant and material to the jury's evaluation of the reliability of Perez's identification of Ayala as the shooter. Whether and to what extent this episode may have affected his ability to accurately

23

recall and relate whatever he perceived at the time of the shooting was a question of fact for the jury to decide.  The jury was never allowed to make that evaluation because, contrary to the SJC's finding, the evidence was never aired at trial, and was not available to counsel during cross-examination.

*Marijuana addiction*

The SJC's findings were also unreasonable as to the information contained in the missing records regarding Perez's use of cannabis.  At trial, Perez said he used cannabis occasionally, when he had night terrors, to help him sleep.  This testimony is completely contradicted by the psychological records received after trial.  The records show that Perez had been abusing cannabis since at least April of 2000, that he admitted to smoking three and a half grams a day, that he does not think he will ever be able to quit.  The missing records show that he could not stop even though his cannabis use was causing him problems with probation because of repeated urine tests.  S.A. II/188-89.

Finally, in the note from the day after the shooting, Perez told his doctors that Ramkissoon had been drinking that night, but that he had only had two beers, after which he said, "I use marijuana."  S.A. I/051.  This statement suggests that Perez had only consumed two beers because he used marijuana.  This evidence could have been used as a foundation for trial counsel to ask Perez about his marijuana use that night.  Even if Perez denied that he had smoked that night and morning, this statement, along with evidence regarding the quantity of marijuana

24

Perez said he smoked each day, and his ongoing inability to quit, would have provided sufficient evidence for counsel to argue, and for the jury to infer, that Perez had been using marijuana on the night of the shooting.

As it was, based on Perez's testimony, the jury was given no reason to doubt Perez when he said he smoked only occasionally, and only when he had night terrors. Combined with his earlier testimony that his PTSD was much better, a juror might have inferred that Perez was no longer using cannabis at all. The jury was left with this false impression because, contrary to the SJC's findings of fact, the evidence in the records that contradict this impression was never aired at trial. Trial counsel did not have the information at his disposal to use in cross-examination. Trial counsel did not and could not engage in any detailed cross-examination because he had no factual basis for asking the questions – because he had simply failed to notice that he had not received Perez's psychological records. The SJC's adoption of the motion judge's finding that "these issues were sufficiently aired before the jury, the additional records would not have 'added to the information already at [trial counsel's] disposal and used in cross-examination at trial" is directly contradicted by the record. The SJC's findings are, therefore, entirely unreasonable.

*Effect of mental health issues and marijuana addition on witness's perception*

The SJC made a further unreasonable finding: that there was, "no evidence – either introduced at trial or contained within the missing records – that suggests

25

that Perez's mental health struggles or drug use affected his ability to perceive the Petitioner on the morning of the shooting." *Commonwealth v. Ayala*, 481 Mass. 46, 66 (2018). This finding of fact is also directly contradicted by the records discussed above. The record, particularly the note from the day after the shooting, contain direct evidence that Perez was suffering from a PTSD episode on the night and morning of the shooting. With this record counsel could have argued that this episode, which had so clearly shaken him, had affected Perez's ability to accurately perceive and recall events from the incident. The records also contain evidence that the jury could have used to infer that Perez had been smoking marijuana that night, from which they could have inferred that his marijuana consumption may also have impaired his ability to accurately perceive and recall events of that morning. The jury could also have inferred that the two things acting together may have made Perez's perceptive abilities even less reliable.

The reason there was no evidence of any of this presented at trial was because of trial counsel's unprofessional failure to notice that he did not have the psychological records he was entitled to. There was no evidence presented at trial that Perez had used cannabis that night because Perez downplayed his use of the substance, and counsel was unable to challenge that false impression because he lacked the psychological records. Because he did not have these records, trial counsel had no basis to ask Perez if had used cannabis that night and morning. And because of his failure he could provide the jury with no evidence to back up his argument that Perez's mental health struggles may have impaired his ability to

26

accurately perceive events that morning.

There is no excuse – and certainly no strategic basis – for trial counsel's failure to see that he had not gotten the records he had requested and was entitled to.  The records he did receive consist of a cover letter stating that Perez had been treated for PTSD since 2000, but gave no details.  S.A. II/0007.  This was followed by several pages listing the time and date of each of Perez's visits.  The remainder of the records have no bearing on those visits at all, and instead appear to relate to Perez's various physical ailments between March and July or August of 2009.  S.A. II/008-050.[4]  These facts should have alerted counsel that these records were not relevant to the records was supposed to have gotten, records covering Perez's psychological health and substance use in the years and months prior to the shooting on June 10, 2007.

A reasonable attorney would have noticed, and would have done something to correct the error.  The SJC's unreasonable factual findings alone require this court reverse Ayala's conviction and remand for a new trial.  It is clearly not true that there is no evidence in the record suggesting Perez's mental health issues were not affecting him on the morning of the shooting in a way that could have affected his ability to perceive the shooter.  It is not correct that the missing records contained no information counsel did not already have; nor is there any support for the finding that the issues were sufficiently aired before the jury.  The 256 pages of

---

[4]  Perez's psychological records are at S.A. II/051-307.

psychological records contain voluminous information that counsel did not have because counsel failed to obtain them.

Instead, the issues were misleadingly aired before the jury, and the lack of records prevented trial counsel from correcting the erroneous impression left by Perez's testimony.  The evidence actually heard by the jury gave them no reason to think that Perez had been anything other than truthful with them, while the psychological records would have allowed Ayala to show that he had been, at best, less than forthcoming about these issues, and, at worst, he was knowingly lying to present himself as a competent, normal witness.  The exposure of these misstatements would have severely damaged his credibility.  More  importantly, the psychological records would have allowed trial counsel to directly cast doubt on Perez's mental state and ability to make a reliable identification on the night of the shooting.

The records presented with this petition establish by clear and convincing evidence that the SJC's findings of fact are simply incorrect, and entitled to no presumption of correctness.  Contradicted at they are by the records, the SJC findings are unreasonable.


*The effect of counsel's not having the psychology records is exacerbated by the lack of an expert to explain them to the jury*

Counsel should have obtained Perez's mental health records and he should have retained an expert to explain them to the jury and to opine about the effect of

Perez's mental illnesses and drug addiction had on his credibility and the reliability

of his identification. The SJC's conclusion that Ayala was not prejudiced by trial

counsel's failure to call an expert to examine Perez's records and render an opinion

as to his mental state was based in part on its incorrect and unreasonable finding

that the "Defendant's proffered expert on this point would not have materially added

to the defense." *Ayala,* 481 Mass. at 67.  Ayala has already amply demonstrated

that the missing records show that Perez was experiencing symptoms of PTSD on

the morning of the shooting, but the expert's opinion would have explained in detail

to the jury the significance of the PTSD on Perez at the time of the shooting:

> [It is] my opinion that Mr. Perez was suffering from post traumatic stress
> symptoms prior to, during, and after the incident of June 10, 2007. Post
> traumatic stress disorder refers to an emotional condition that can occur as a
> result of exposure to life threatening or extremely traumatic events. A key
> aspect of post traumatic stress disorder is that following a traumatic event a
> person may become emotionally very reactive to reminders of the original
> trauma. For example, reminder cues such as smells, sounds, and images of the
> original traumatic event can elicit strong emotional reactions and a person
> may feel as if he is back in the original traumatic event, even though the
> event itself may have occurred in the distant past. This is often referred to as
> a flashback. Other aspects of post traumatic stress disorder include intrusive
> memories, attempts to avoid thoughts and feelings of the traumatic event,
> high anxiety and fear, sleep problems, and nightmares.

The SJC's finding that "there was no evidence that [Perez] was under the

influence of marijuana on the morning of the shooting" was unreasonable in that the

expert opined: "It is also my opinion that Mr. Perez was suffering from marijuana

use disorder prior to, during, and after the incident of June 10, 2007. *Ayala,* 418

Mass. 66-67;  S.A. II/66-67.  The SJC's further finding that the proffered expert on

Perez's marijuana use would not have materially added to the defense was also

unreasonable.  *Id.*  The expert could have informed the jury that "Marijuana use disorder indicates that use of marijuana has reached a threshold of clinical concern. The use of a mind altering chemical, such as marijuana, becomes a clinical concern when people lose control over the amount consumed, are unable to stop using it when they want to stop, and when they continue using it even though it causes harm to their lives."  S.A. II/315.

The SJC compounded their errors with further unreasonable findings that, the defense expert's proffered testimony only acknowledged that Perez's mental health struggles "had the potential to and may have interfered with Mr. Perez's abilities to accurately perceive and recollect the shooting."  *Ayala*, 481 Mass. at 66. As the affidavit of the defense's proffered expert plainly shows, he was prepared to testify to much more than that.  S.A. II/310-16.  According to the defense's proffered expert, the record shows that Perez was suffering symptoms of PTSD "before, during, and after" the shooting.  The incident "appears to have overwhelmed [his] already fragile emotional coping capacities," causing him to "[r]e-experience[] a traumatic event in the form of flashbacks," which in turn "increase[d] the level of emotional reactivity and affect[ed] [his] perception of reality and recall."  S.A. II/316. The expert was prepared to testify that in his opinion Perez was suffering symptoms severe enough to have overwhelmed him, leaving him emotionally reactive and affecting his abilities to perceive and recall.  Thus the SJC's determination that he would only have said Perez's "mental health struggles had the potential to and may have interfered with Perez's ability to accurately perceive and recall events,

30

contradicted as it is by the experts affidavit, is also unreasonable.

The SJC also suggested that trial counsel's closing argument – that Perez's "difficult illnesses" may have affected "his ability to see and conceptualize what was actually happening" – told the jury the same thing the expert would have said, so that the evidence would not have been likely to have affected the verdict. *Ayala*, 481 Mass. at 66. In fact, counsel's argument did not, and could not have, presented the jury with the "substance" of the "missing records and proffered expert testimony." Counsel's argument was just that – argument. It asked the jury to infer that Perez could have been having PTSD symptom, despite his testimony otherwise, and then infer that those symptoms then missing records showing that Perez not only had PTSD, but that he was actually experiencing symptoms at the time of the shooting. Counsel's argument could not inform the jury of this fact, thus his argument was based on no more than speculation. The jury needed to hear from a psychological expert to understand the importance of the impact of Perez's mental health issues on his ability to accurately perceive or recollect the events of June 10, 2007.

2.      Counsel's failure to retain an expert on eyewitness identification

In his affidavit presented with the motion for new trial, counsel stated, "At no point prior to or during trial did I consider consulting with or calling an eyewitness identification expert to testify in this case." S.A. I/460. At the motion for new trial hearing, trial counsel testified that he had tried forty-seven first-degree murder cases and in none of those cases had he ever called an expert in eyewitness

identification to testify. Tr. 10/27/2015: 113. In this case, he said, he felt the presentation of the defense's single eyewitness testimony, along with cross-examination of the Commonwealth's eyewitness would "adequately" present the case to the jury. Tr. 10/27/2015: 114. What is clear from the affidavit and testimony, is that trial counsel did no investigation into the issue. It was something he had never done, and he "simply never considered it." S.A. I/461.

Counsel knew before trial that the Commonwealth only had one eyewitness who would testify that Ayala was the person who shot Clive Ramkissoon. Counsel knew that the eyewitness's statements indicated that he had seen the shooter's face for only an instant, at night, after seeing Ayala behave in an aggressive way at a party nearby.

Without an expert, trial counsel was unable to educate the jury as to issues they likely had no idea even existed, such as:

- the possibility that Perez identified Ayala as the shooter precisely because he had seen Ayala earlier in a situation that caused him anxiety and was later shown a lineup in which that anxiety-provoking face appeared.

- Under high stress, the accuracy of Perez's identification declined. Tr. 10/22/15: 84. Most people, i.e. jurors, tend to believe that seeing something under intense stress "burns a memory into the brain such that it becomes even stronger and more accurate" is untrue, when, in fact, highly stressed persons tend to have less accurate memories of those events. 10/22/15: 82-84.

- When the time during which the witness actually saw the action or person to be remembered is short – such as the split second here – are associated with worse memory performance. Tr. 10/22/15: 86.

- Where a witness has been focused on a particular person before the incident in question – as here, seeing Ayala at the party – the witness may merely identify that person as the perpetrator when the reality is that person is

32

someone the witness remembers from the earlier instance.  This phenomenon is known as transference, and the jury should have been aware of it.  Tr. 10/27/2015: 36-37.

-   There is no correlation between confidence and accuracy, and most jurors tend to believe that the apparent confidence a person has in their identification is a strong indicator that the identification is accurate. Tr. 10/22/15: 79-81.

-   Post-event information, "has a way of contaminating our original memories to the point where we can't differentiate what we actually saw versus what we now think we saw from information we later learned." Id. at 87-88.  For instance, being told by an investigator that you have chosen the right subject can influence memory.  Tr. 10/22/15: 90.

Trial counsel did not decide not to hire an expert on eyewitness identification. He simply never thought about it.  The SJC's determination that counsel's failure to hire an expert on eyewitness identification was not an unreasonable "decision" is, therefore, itself unreasonable.

4.   Counsel's failure to retain a ballistics expert

In examining Ayala's claim that counsel was ineffective for failing to secure an expert on ballistics, the SJC stated that because there was evidence "establishing that the crime scene was illuminated," even if an expert had testified that Perez could not have been able to see the shooter's face in the muzzle flash of a .22 caliber pistol, that testimony would not have been "likely to have influenced the jury's conclusion." *Ayala,* 481 Mass. at 65.

This argument itself is unreasonable, in that it ignores entirely the central issue at trial: the credibility of Perez.  Whether there was sufficient evidence for the jury to have inferred that Perez could have seen the shooter's face in the ambient

33

light, the fact is that Perez definitively testified that the muzzle flash "illuminated" Ayala's face, and that is how he was able to identify him.  Tr. 8/19/2009: 49. Evidence from a ballistics expert that such a thing was extreme unlikely, if not impossible, would have cast doubt on Perez's credibility and the reliability of his identification.

As it stood, the jury had no reason to question Perez's claim, no reason to believe he was either mistaken or not telling the truth.  Perez's credibility being the single most important issue for the jury to resolve, any evidence which directly contradicted his account would have had an enormous impact on the jury's deliberations.  Counsel's failure to retain firearms experts was manifestly unreasonable as it permitted Perez's impossible identification by muzzle flash tto go unrebutted.

**B.**     **THE STATE COURT DECISION ON THE INEFFECTIVE ASSISTANCE OF COUNSEL ISSUE WAS CONTRARY TO AND INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS DETERMINED BY THE SUPREME COURT IN *STRICKLAND V. WASHINGTON***

In this case, the SJC examined each of Ayala's claims of ineffective assistance individually, and made no effort to consider the totality of the omitted evidence in light of the evidence presented at trial.  This failure is by itself an unreasonable application of clearly established federal law as interpreted by the Supreme Court in *Strickland v. Washington* and *Williams v. Taylor.  Strickland v. Washington*, 466 U.S. 668, 669 (1984); *Williams v. Taylor,* 529 U.S. 362, 416 (2000) (Virginia Supreme

Court's decision an unreasonable application of *Strickland* in part because of its

"obvious failure to consider the totality of the omitted … evidence").  An examination

of the omitted evidence in light of the evidence presented at trial demonstrates just

how unreasonable the SJC's application of *Strickland* to Ayala's case was.

The only issue for the jury was to determine the credibility of Perez's

testimony and evaluate the reliability of his identification of Ayala as the shooter.

If, as it appears, they credited his testimony and found his identification reliable,

then they would, as they did, convict Ayala.  If they found him not to be credible or

questioned the reliability of his identification, they would have had no choice but to

acquit.

Had the SJC actually examined the totality of the evidence regarding the

Petitioner's claims, including the evidence presented in the motion for new trial

hearing, the Court would have been forced to conclude that there was a "reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland*, 466 U.S. at 694.  As the evidence discussed

above shows, when the jury in this case was evaluating Perez's credibility, they had

been given no reason to think he was anything other than credible.  Counsel had

managed to show that Perez suffered from PTSD, and that his testimony regarding

Ayala's clothing and height had changed over time.  But Perez explained these

inconsistencies, and counsel's cross-examination had not shown him to be

intentionally untruthful.  Thus the jury were given no reason to suspect that the

inconsistencies in his statements about his description of the shooter were anything

other than minor lapses in memory.

     1.     Counsel's failure to notice that he had not received the psychological
           records of the Commonwealth's sole witness.

In reviewing the totality of the evidence, the Supreme Court has said that "some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695-96.

The Commonwealth could not have made its case without the testimony of Perez. Without Perez's identification testimony, the Commonwealth's evidence would have shown only that Ayala had engaged in an altercation at a party near the shooting, and that sometime later Clive Ramkissoon was shot on the street nearby. Perez's testimony created the necessary link between these two otherwise disparate events, allowing the Commonwealth to argue that one led to the other. A conviction that rests entirely on the eyewitness testimony of a man who claimed to have seen the perpetrator's face for a fleeting second in poor lighting conditions is already exceedingly weak. Evidence that would have shown that the witness who made that identification had misled the jury, and that he was experiencing symptoms of PTSD and was likely under the influence of cannabis at the time of the shooting, would have undermined the one thing the Commonwealth absolutely needed to obtain a

conviction – the jury finding Perez credible and his identification of Ayala reliable.

In light of the weakness of the Commonwealth's case, and the importance of Perez's identification of Ayala as the shooter, the evidence presented in the missing records undermines any court's confidence in the jury's verdict. There is a reasonable probability that, absent counsel's errors, the outcome of this case would have been different. *Strickland*, 466 U.S. at 694. The SJC's decision to the contrary, resting as it does on findings of fact that are clearly contradicted by the record, was an unreasonable application of *Strickland*.

As the SJC mentioned several times, there was no evidence presented to the jury that Perez had experienced any symptoms from his PTSD, and no evidence he had been using marijuana that night. Since there is evidence of both in the missing records, the reason the jury heard no such evidence: because Perez lied about the extent of his cannabis use, and offered misleading testimony about the effects his PTSD was having on him and, trial counsel did not have the records which would have allowed him to establish that Perez was experiencing PTSD symptoms on the night of the shooting, and that he was a heavy cannabis abuser, one who could not quit despite it causing him legal problems, and had made statements to his doctor strongly implying he had been smoking marijuana on the night of the shooting. Had trial counsel rendered even minimally effective assistance, there would have been evidence at trial that Perez likely used marijuana that night. There also would have been evidence, from the records and petitioner's proffered expert, that Perez was experiencing PTSD symptoms at the time of the shooting.

37

"No aspect of the United States' adversar[ial] system could be more important than the opportunity finally to marshal the evidence for each side before the submission of the case to judgment." *Herring v. New York*, 422 U.S. 853, 862 (1975). Counsel's failure to recognize that he had not received psychological records which would have dramatically weakened the credibility and reliability of the Commonwealth's only identification witness  fell below the level of reasonable performance. *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

2.      Counsel's failure to retain an expert on eyewitness identification

In *Strickland*, the Supreme Court said "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-691.  In this case, counsel made no investigation into issues regarding eyewitness identification, therefore his "decision" not to call one, or even seek funds to hire such an expert to discuss the issues raised in this case so that he could make a reasoned decision whether to have the expert testify at trial, was unreasonable.

Knowing these facts, a reasonable attorney would have, at the very least, sought advice from an expert on eyewitness identification to educate himself as to the numerous issues raised by these facts.  Had he done even minimal investigation, trial counsel would have known that cross-examination of Perez would not do anything to counter the jury's own common-sense but mistaken beliefs about memory and eyewitness identification.  Cross-examination could not explain to the

38

jury that whatever confidence Perez showed in his identification did not correlate with the accuracy of his identification.  It did nothing to explain to the jury that persons under extreme stress are less likely to remember events accurately, while in general lay people tend to think precisely the opposite.  There is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 669.

> 3.     Counsel's failure to retain a firearms expert

The SJC's ruling to the contrary fails to recognize or address this central issue makes its determination that the Petitioner was not prejudiced by the failure to secure a ballistics expert an unreasonable application of *Strickland.* Had counsel hired an expert on ballistics, the jury would have learned that Perez's account of how he had seen Ayala's face was almost certainly impossible, further casting doubt on his credibility and reliability.

The entirety of Perez's identification was by the light of muzzle flash, which has was amply demonstrated to be impossible by two firearms experts.  Simply put, the jury had no basis to understand that Perez's identification was not possible the way he said it was.  "Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Harrington v. Richter*, 562 U.S. 86, 106 (2011).  This is such a case.  There is a reasonable probability that, absent counsel's error, the jury would have had a reasonable doubt respecting guilt.  *Strickland*, 466 U.S. at 695.

4.      Conclusion: The totality of the omitted evidence

A state court decision that reveals an obvious failure to consider the totality of the omitted evidence "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." *Williams v. Taylor*, 529 U.S. 362, 416 (2000).

Each of counsel's errors deprived Ayala of evidence that could have attacked the credibility and reliability of the Commonwealth's only eyewitness.  The evidence that should have been presented at trial went to the heart of the Commonwealth's already weak case, and would have had a "pervasive effect [which would have] altered the entire evidentiary picture."  *Strickland*, 466 U.S. at 495.  In its decision, the SJC failed to look at the totality of the evidence presented at both the trial and the new trial hearing, and failed to acknowledge the meaning or effect the evidence presented at that hearing would have had in relation to the weakness of the Commonwealth's case.  This was an unreasonable application of *Williams* and *Strickland.*

Looking at the all the evidence, it is clear that, absent counsel's unprofessional errors, the jury would have had evidence that would have entirely altered their evaluation of Perez's credibility and the reliability of his identification of Ayala as the shooter.  As that was the only evidence the prosecution provided to prove that Ayala was the shooter, there is a reasonable probability that, absent counsel's errors, the result of the proceeding would have been different.

Moreover, there is a reasonable probability, based on a review of all the

evidence, that counsel's errors have allowed an innocent man to be convicted of first-degree murder, a crime for which he will spend the rest of his natural life in prison. Where a solution to this uncertainty is possible – a new trial in which a jury is presented with all of the relevant evidence regarding the government's only eyewitness's mental health, mental state and drug use on the night of the shooting – this court should not let this conviction stand. The writ must issue.

II.   **THE STATE COURT DECISION ON THE SUFFICIENCY OF EVIDENCE WAS CONTRARY TO AND INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS DETERMINED BY THE SUPREME COURT IN *JACKSON V. VIRGINIA*, AND IT WAS BASED ON MULTIPLE UNREASONABLE DETERMINATIONS OF FACTS IN LIGHT OF THE EVIDENCE PRESENTED.**

*Factual background*

At trial, eyewitness Perez testified that he identified the shooter as the person he had seen on the staircase because the muzzle flash "illuminated" the shooter's face. Tr. 8/19/2009: 48-50. Specifically, Perez testified: "When the muzzle flash went off, I was already pointed in that area. It illuminated Mr. Ayala's face." Tr. 8/19/2009: 48.

*Unreasonable determinations of facts in light of the evidence presented*

Perez's testimony was that he was able to see the shooter's face and identify him because it was illuminated by the muzzle flash. 8/19/2009:48. Perez did not know if the streetlight was on. 8/19/2009: 95. The SJC unreasonably found that because a police officer testified that when he arrived at the scene at 4:30, the

41

streetlight was on, then it can be inferred that it was on during the shooting.  *Ayala*, 481 Mass. at 51.  That finding, however, is speculative because it is quite possible that the police had the streetlights turned on in addition to the usual police lighting used to examine a crime scene in the dark.  The Commonwealth's ballistics officer testified that in the day time or a well-lit area, it would be difficult to see the muzzle flash, but in the dark you would be able to see it.  Tr. 08/20/2009:70.  He also testified that the larger the caliber weapon, the more muzzle flash that you would see.[5]  Tr. 08/20/2009:60.

As argued by the Defendant to the SJC, unlike the light from automobile headlights, streetlights, flash lights, and candle light, ordinary jurors do not have experience with the light created by a muzzle flash. Ordinary jurors cannot be presumed to be familiar with the size, direction, brightness and duration of muzzle flash created by firing .22 ammunition either during the day or night.  Without such evidence, no rational juror could find that Perez's identification testimony was reliable.

The SJC made further unreasonable determinations of facts with respect to its finding that the jury heard testimony that Perez had observed the defendant for several minutes earlier in the morning while he was in the stairwell.  *Ayala*, 481 Mass. at 52.  First, that fact is irrelevant because Perez's identification of Ayala

---

[5]  Although not available to the jury, the defense expert in the field of ballistics and blasts who testified at the MNT hearing said that if the streetlight were on, a muzzle flash from a .22 ammunition simply does not illuminate the face. Tr. 10/22/15:5.

earlier does not prove that he correctly identified him as the shooter.

Moreover, by the time of trial, Perez had completely changed his description of Ayala from what he told the police just after the incident to what he learned Ayala looked like. In Perez's statements to the police, he said, "I saw a tall, light-skinned black male, possibly Hispanic but I think he was black, about 6' 0" to 6'1" tall wearing a matching coat and pants set with a short faded haircut. S.A. II/452-55. He was about 20-30 years old and he was kind of muscular about 180-200 pounds.[6] He may have had a diamond stud in his ear and a thin goatee." S.A. II/452. Perez said that the shooter was wearing, "the exact same outfit as the guy from the stairwell," which he had described as a matching pants and coat set. S.A. II/454. By the time of trial, Perez had changed the description of what Ayala was wearing, saying he had on a white or green t-shirt with a skull on it and shorts whose color he could not recall. 8/19/2009: 58. He then admitted these were the clothes which Ayala happened to be wearing the day he was arraigned. 8/19/2009: 67. Perez also abandoned his description of Ayala's height. 8/19/2009: 72. He attempted to explain his mistake by saying that when he first saw Ayala, he and Ayala were standing on the stairs in the house and so he could not make an accurate estimate of Ayala's height. 8/19/2009: 56. Indeed, By the time of trial, Perez had retreated from almost every statement he made which might have supported his identification of the shooter. Instead, his descriptions changed to match what Ayala looked like. This

---

[6] Although not part of the record, the Defendant was 5' 7" tall and weighed 147 pounds.

shows that Perez had, consciously or not, decided that Ayala must be the shooter and was adjusting the facts to fit a person he had already seen and focused on as a source of possible danger.

The SJC also relied on other evidence that "would have allowed them to assess the reliability of Perez's identification" – the fact that Perez observed the Defendant on the staircase, observed him again from the balcony, and identified him in the photo array.  The Petitioner does not deny being present at the scene prior to the shooting, so the fact that Perez could identify him when he was there does not bolster the fact that Perez correctly identified Ayala as the shooter.

In addition, the circumstantial evidence relied on by the SJC "linking the Defendant to the shooting" – refusal to be searched, visibly upset, and kicking the door – does nothing to link the Defendant to the shooting.  The facts that Ayala had kicked the door and said he would return to "light up the place" were irrelevant because the shooting did not occur at the house where the party was and it was not directed at anyone with whom Ayala had any prior contact at the party.

No physical or forensic evidence  connected Ayala to the shooting, and no other witness testified to seeing him shoot Ramkissoon while there were other people on the street at that time.  The shooting occurred in a public area where many people had access and an opportunity to commit the crime. Nor was there any evidence of any connection between Ayala and Ramkissoon, connection to witness Perez, or connection to the woman with them.  There was no evidence of consciousness of guilt, no admissions, and no evidence that Ayala had a gun or had

44

access to a gun.  There was no evidence of any threats, hostility, or other type of relationship between Ayala and the victim and certainly no motive for Ayala to shoot and kill Ramkissoon.

*Unreasonable application of federal law*

Relying on *Commonwealth v. Latimore*, the SJC held that the evidence, when viewed in the light most favorable to the Commonwealth and taken with the reasonable inferences, was sufficient to support the jury's verdict that Defendant was the one who shot and killed the victim.  *Commonwealth v. Latimore*, 378 Mass. 671, 677-78 (1979).

*Latimore* was decided in August, 1979, and it relied heavily on *Jackson v. Virginia*, decided by the Supreme Court two months before.  In *Latimore*, the Court held that the relevant question is "after viewing the evidence in the light most favorable to the prosecution, **any** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id*, *quoting Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis is original).  To sustain the denial of a directed verdict, "it is not enough for the appellate court to find that there was some record evidence, however slight, to support each essential element of the offense; it must find that there was enough evidence that could have satisfied a rational trier of fact of each such element beyond a reasonable doubt. We consider the directed verdicts standard required by *Jackson v. Virginia, supra*."  *Latimore*, 378 Mass. at 677–78.

Here, the appellate court attempted to find "some record evidence" of the essential element of the identification of Ayala as the shooter. That evidence, as set out above, was "slight" and was based on unreasonable interpretations of the facts. After viewing the evidence in the light most favorable to the Commonwealth, the SJC's determination that that evidence was sufficient to support the jury's verdict was an unreasonable application of *Jackson v. Virginia*.

Moreover, under *In re Winship*, it is clear that "a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim." *Jackson v. Virginia*, 443 U.S. at 321. The witness's identification of Ayala as the shooter was simply not supported by sufficient evidence to find guilt beyond a reasonable doubt. The SJC's determination otherwise was an unreasonable application of *In re Winship*. In his concurrence, Justice Harlan noted, "I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free. *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring).

III.   **THE STATE COURT DECISION ON THE DENIAL OF ACCESS TO EVIDENCE REGARDING A WITNESS WHO WAS A CONFIDENTIAL INFORMANT WAS CONTRARY TO AND INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS DETERMINED BY THE SUPREME COURT IN *WASHINGTON V. TEXAS,* AND IT WAS BASED ON MULTIPLE UNREASONABLE DETERMINATIONS OF FACTS IN LIGHT OF THE EVIDENCE.**

*Factual background with respect to witness N.F.*

Defense witness, N.F., was a paid confidential informant by the federal government for the Western Mass Gang Task Force, which included both state and federal officers. Tr. 8/21/2009: 9. N.F. was originally a witness for the Commonwealth, but, on July 17, the Commonwealth struck N.F. from its witness list. Tr. 8/24/2009:31, S.A. 145-46.

On the night of the shooting, N.F. was working as a D.J. at the after-hours party, and she had known Philip Ayala for many years. She testified at a deposition three months before trial, and she testified at trial for the defense. The two sets of testimony differed from each other: in the deposition, she gave Ayala a complete alibi; at trial, she changed that testimony.

The dilemma created by her changed testimony and by the interference with the FBI prompted the defense to file a Motion for a Mistrial the day after her testimony, and it created a Fifth Amendment issue for the witness. The issues were discussed at length by the parties out of hearing of the jury. Tr. 8/21/2009: 7-43.

N.F.'s deposition. Three months prior to trial, N.F. was deposed by defense counsel and the prosecuting attorney. At that deposition, N.F. testified that she had been the victim of a shooting and received $3,000 from the FBI after the shooter was convicted, which she used to move to South Carolina for six months. A. 178. As of the date of the deposition, May 27, 2009, she said she was still acting as a paid informant and had received $500 a month previously for helping catch someone from "America's Most Wanted," and that she had a phone they paid for. A. 179. She

47

testified she received money more than once, that sometimes the

money was brought to her home and sometimes she went to pick it up at the FBI

offices in Springfield.  A. 178.

In the middle of the deposition, defense counsel asked her the name of her

federal handler, and she provided two names.  S.A. I/297.  Defense counsel asked her

if they gave her any advise about her deposition testimony, and she said one of the

officers had told her the previous day to just tell the truth.  S.A. I/297.

N.F. testified that she worked as a D.J. at parties and that the parties she

worked always involved her informant work; she said that she would not go to one of

these parties if her federal "handlers" were not with her or did not know she was

working a party.  A. 180, 185.  She further testified that she spoke to her handlers

by phone on the night of the shooting and spoke to them personally some days later.

A. 185.

In her deposition testimony, N.F. testified to a complete alibi for Philip Ayala.

The night of the shooting when she was working as a disc jockey when Ayala showed

up at the party.  S.A. I/291.  He was upset about his niece who had been shot.  She

went to speak with him, and she saw that he was outside shouting.  S.A. I/291-92.

She ran downstairs when he kicked the door, and she and others went to him  to

comfort him.  S.A. I/292.  After she and the others spoke to him and hugged him to

calm him down, he got into his car, a tan Cherokee, drove down Wilbraham Road

and turned left on Suffolk Street.  S.A. I/292.  While Ayala was driving away in one

direction, she heard shots being fired from another direction.  S.A. I/292-93.  She

48

then ran in the direction of the shots where she saw a heavy set man [not Ayala] climb into a maroon Ford Taurus which then drove off.  S.A.I/292.

    <u>N.F.'s different trial testimony</u>.  At trial, N.F. testified completely differently. She testified that from the time of the shooting until June 2009 she had been a paid informant for the United States, Tr. 8/20/2009:10 128,10.

    N.F. knew Ayala growing up as somebody older to whom she looked up.  Tr. 8/20/2009: 132.  A week prior to the night of the shooting, Ayala's fourteen-year old niece was shot and killed next door to the where the party was being held. 8/20/2009: 132.  She said when Ayala had been outside the party, he was crying. 8/20/2009: 133.  He told her it wasn't fair that there was a party being held so near where his niece had been killed when "she hadn't laid herself down in the ground yet." 8/20/2009: 133.   According to N.F., some friends came out and they gave him a group hug and told him they were going to get him into the party.  When he was not allowed in, Ayala became angry and kicked the door in.  8/20/2009: 134.  N.F. went outside again, there was another group hug, and Ayala left.  *Id*.  She said she walked him to his car and watched him drive away.  8/20/2009: 135.

    At this point, N.F. changed her testimony from the deposition testimony.  She said that at the time of the shooting she was on the porch, and she saw Sims and the victim in the street, Sims with her pants down.  8/20/2009: 137-38.  Then she heard gunfire; she ran downstairs and saw someone lying on the sidewalk and a red or maroon Taurus skidding off.  8/20/2009: 138-39.  She testified that by that time Ayala was "long gone."  8/20/2009: 138-39.  At the deposition, N.F. had testified that

the shooting began while she watched Ayala drive away in the other direction, giving Ayala a complete alibi. S.A. I/292. At trial she testified that she did not see Ayala at the moment of the shooting because he had already left. Tr. 8/20/2009: 139-40. She merely testified, "He was not there. Put my kids on it."

After the shooting, she called some police officers who "worked with [her] at the club." 8/20/2009: 141. These officers were connected to the Western Mass Gang Task Force which she knew was financed by the United States. 8/20/2009: 141-42. She received money from them prior to June 10, 2007, and appeared to suggest that the last time she received money was prior to her giving information to the police in this case. 8/20/2009: 141-42.

On cross-examination, N.F. then testified that in fact she was not paid for giving information on gangs, but had been paid only once for giving information about the person who had shot her years before. 8/20/2009: 155. She said she got "a big check" when that person was convicted and "that's it." 8/20/2009: 156.

N.F.'s affidavit. The day after her testimony on August 21, 2009, N.F. provided the defense with an affidavit in which she said she had not received any money from the FBI since giving testimony in the deposition, she had been told by government agents not to reveal any information regarding payment for information that she might have given federal agents, that she would not be given any more money until the Ayala trial was over, and that a higher up at the FBI known only as

"Mark" was unhappy with her because of her involvement in this case.[7]  S.A. II/005-6.

On the day at trial following N.F.'s changed testimony, the Petitioner sought a mistrial, arguing that the affidavit indicated the witness had been intimidated by the FBI.  Tr. 8/21/2009: 10; S.A. II/.   The Prosecutor also expressed her concern to the Court that N.F. may have perjured herself when she testified that she had been paid only for providing information on the person who had shot her, not for giving information about gang activity.  Tr. 8/21/2009: 20-21.  Defense counsel agreed that this was a concern and discussed whether counsel should be appointed for her.  Tr. 8/21/2009: 20-21.  "We are...faced with the situation that I believe on the record created that this witness has basically been told to lie in these proceedings by federal officers."  Tr. 8/21/2009: 34.

Prior to trial, the Petitioner had filed a Motion to Dismiss based on the Commonwealth's failure to turn over discovery material, specifically, the evidence he had sought from the FBI which, he continued to argue, the Commonwealth was obliged to provide.  S.A. I/276.  On the last day of trial, the Petitioner made an oral Motion for Reconsideration of the Motion to Dismiss and further filed a written Motion for a Mistrial, both of which were denied.  In the Motion for Mistrial, counsel

---

[7]  Mark Carinjeekis [sic] is the federal agent in charge of the Western Mass Gang Task Force.  8/21/2009: 15.  His name is actually spelled Mark Karangekis, and he is the FBI Supervisor who heads the Springfield office of the FBI.  https://www.berkshireeagle.com/stories/fbi-searches-lee-police-department-chief-buf fis-retains-attorney,284295 (last visited 9/23/20).

argued that there was evidence that the federal government was intimidating his witness by removing her financial support and telling her she was not to reveal any payments or procedures.  Tr. 8/21/2009: 10; S.A. 285.  Following denials of the defense motions, defense counsel told the judge he wanted to call Officer Condon.  He informed the Court that he would ask Condon whether N.F. was a CI and when.  He also told the judge that he wanted to ask how much money she was paid and what information she had turned over.  Tr. 8/24/2009: 26-27.  But the Petitioner was not allowed to call Officer Condon.

Procedural background of defense efforts.  A year before trial, the prosecution disclosed that N.F. had been and might still be an informant for the FBI.  Tr. 7/11/08: 33.  Also on that day, the prosecution filed a motion for a protective order with an affidavit in which she announced this discovery and that she had been told by the FBI that disclosure of this information could put N.F. at risk.  On July 11, defense counsel requested that his investigator be included in the protective order so he could interview N.F.  Tr. 7/11/08: 20.  Defense counsel asserted that he believed with this investigation he could "find out her handler, ... how much money they paid her, what cases she testified to, and whether or not that information they had from this witness was verified in this previous information."  Tr. 7/11/08:  27.

Shortly thereafter, the Petitioner filed a motion for exculpatory evidence, including the entirety of the FBI file on N.F. which he maintained was mandated by the Attorney General's Guidelines Regarding the Use of Confidential Informants.  S.A. 151-73.  That motion was denied, with the suggestion that counsel attempt to

subpoena the federal authorities.  Tr. 7/17/08, 36.  The Court stated, "[t]o the extent that [N.F.'s] credibility can be bolstered by cooperation with law enforcement authorities, that is certainly exculpatory and should be turned over to the defense." Tr. 7/11/08: 37.

On July 25, 2008, the Petitioner filed a motion for subpoenas, which was allowed, and subpoenas were issued to the DEA, ATF, FBI and various state police agencies on August 11, 2008.  The United States filed a motion to quash the subpoenas to the DEA, ATF and FBI, arguing that, pursuant to 5 U.S.C. § 301 and *United States ex. Rel. Touhy v. Ragen*, 540 U.S. 462, 468 (1951), (referred to in the case law as "*Touhy* procedures") in order to get records from any of these agencies counsel was required to follow DOJ regulations.  28 C.F.R. 16.22-25.  On September 26, 2008, that motion was allowed and the subpoenas were quashed.  (Rup, J.).

Subsequently, the Petitioner filed motions for summonses, to Detectives Sean Condon, Robert Lockett and James Mazza, and A.U.S.A. Karen Goodwin.  The government again requested that the Court quash the subpoenas because the Petitioner had not followed *Touhy* procedures, and these motions were also allowed (Velis, J.).  The Petitioner sought interlocutory relief to the single justice, which was denied on August 18, 2009 (Ireland, J.).

*Unreasonable determinations of facts in light of the evidence presented*

The SJC completely misinterpreted N.F.'s changed testimony.  In describing her trial testimony, the SJC said, "She testified to ... witnessing the Defendant leave

the party and drive away. N.F. was adamant that the Defendant left approximately thirty to forty-five minutes before the shooting, stating that he was 'gone a long time before [the shooting] even went down.'" In response to further questioning on her certainty that the Defendant was not at the scene at the time of the shooting, she testified, "He was not there. Put my kids on it." *Ayala*, 418 Mass. at 50-51. With respect to N.F.'s deposition testimony, the SJC said, "Specifically, N.F. testified that she witnessed the defendant driving away from the scene before the shooting took place, and instead implicated another individual whom she witnessed fleeing the scene." *Id*. at 55.

The SJC missed the crucial fact from the deposition that the shooting took place exactly as Ayala was driving away: "I watched him go down [the street], and when he was going down the street, we heard Pow Pow." S.A. 292. Her deposition testimony gave the Petitioner a solid alibi. And her hand-written affidavit that she provided to the defense after she testified at trial, certainly inferred that she had been intimidated by the FBI.

The SJC's misinterpreted N.F.'s deposition testimony as being essentially the same as her trial testimony, and in so doing, the SJC failed to recognize the importance of N.F.'s original testimony: a reliable witness who had known Ayala for years, was looking at him driving away at the exact time of the shooting on the street in a different direction. That testimony would have would have seriously cast a doubt on Perez's identification of Ayala – an identification of a stranger whom he had seen earlier in the night, under high stress, made in a split second in the dark.

54

*Unreasonable application of federal law*

Because the SJC erroneously concluded that N.F.'s trial testimony and her deposition testimony were essentially the same, the Court also reached the unreasonable determination, as it went through the *Donahue* factors, that the Defendant was not prejudiced by the nondisclosure. *See Commonwealth v. Donahue*, 396 Mass. 590 (1986) (enumerating factors in determining whether prosecutor is obligated to seek from federal authorities exculpatory evidence requested by defendant include: potential unfairness to defendant; defendant's lack of access to evidence; burden on prosecutor of obtaining evidence; and degree of cooperation between state and federal authorities).  Ayala was enormously prejudiced because he was deprived of putting evidence before the jury of N.F.'s changed testimony and of the FBI's intimidation causing her changed testimony.

Sixth Amendment right to compulsory process

The SJC decision did not address the Petitioner's federal issues at all.  First the Petitioner argued to the SJC that *Washington v. Texas*, which held that the right to offer the testimony of witnesses and to compel their attendance .. "is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  This right is a

55

fundamental element of due process of law grounded in the Sixth Amendment.  *Id.*

Following the denial of all of the defense motions, defense counsel told the judge he wanted to call Springfield Officer Condon, a member of the state/federal gang task force.  Tr. 8/24/2009: 27.  Defense counsel told the Court that he would ask Condon whether N.F. was a confidential informant and when, how much money she was paid, and what information she had turned over.  Tr. 8/24/2009: 26-27.  But the Court would not let the defense call Officer Condon.

This issue was argued to the SJC, but the SJC decision ignored the compulsory process issue altogether.  The defense needed a rebuttal to N.F.'s changed testimony, which not only deprived the Petitioner of his alibi, but actually bolstered the Commonwealth's case.  From N.F.'s post-testimony affidavit, she had not received any money from the federal sources since she gave her deposition.  Prior to her deposition, Officer Condon had told her to testify truthfully in the deposition,[8] and now, prior to her trial testimony, he told her not to "reveal any information about payments or information I have given federal agents in the past."  S.A. I/297; S.A. II/005.  The officers' intimidation of the witness into changing her testimony should have been before the jury.

---

[8]  It is suggested that the officer's name in the transcript of the deposition was misspelled, "Cardin."  Officer Sean Condon was a Springfield police officer and part of the federal/state gang task force. https://www.masslive.com/news/2018/02/new_list_of_police_sergeant_pr.html (last visited 9/30/20).

<u>Commonwealth's duty to remedy false impression</u>

The SJC also ignored the *Giglio* issue.  In *Giglio*, the Supreme Court held that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice,' ... [and] '(t)he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'" *Giglio v. United States*, 405 U.S. 150,153 (1972), *citing Pyle v. Kansas*, 317 U.S. 213 (1942) and *Napue v. Illinois*, 360 U.S. 264 (1959).

There was no argument that N.F. was an informant, and that fact was crucial to an evaluation of her credibility as a witness.  If the necessity of corroborative evidence was not readily apparent before she testified, it became inarguably plain after she testified.

In her deposition testimony, N.F. testified that she was working for the F.B.I. as a paid informant.  S.A. I/295-97.  She had received payments from June 10, 2007 through the date of the deposition, May 27, 2009, having received the most recent payment of $500 about a month prior.  S.A. I/297.  To receive payments, either two officers would come to her house or she would go to an office on the second floor of the F.B.I. building in the Industrial Park and pick up her payment.  S.A. I/296.

At trial, N.F. testified on direct that she was a paid confidential informant from June, 2007 to June, 2009.  Tr. 8/20/09: 128.  However, on cross-examination she testified that she was not paid for giving information on gangs, but had been paid only once for giving information about the person who had shot her years before.  Tr. 8/20/09: 155.  She said she got "a big check" when the person was convicted and

57

"that's it."  Tr. 8/20/09: 155-56.

After his Motion for a Mistrial was denied, defense counsel tried to

rehabilitate his witnes

Q:      in relationship to the testimony that you gave yesterday before this jury, did
        you have any circumstances that affected the testimony that you gave to the
        jury yesterday? Were there any? ... Prior to your giving testimony here in this
        case yesterday, was there anything that affected the testimony that you gave
        here yesterday?

A.      Yeah, there was certain things that you wanted me to answer which there was
        certain individuals that was already outside that seen me, that personal case,
        that they understand was going on and know what was going on.  I can't –
        certain things that I can't say 'cause you all might have my life here right
        now. When I leave this court, I can lose my life.

COURT: Ladies and gentlemen of the jury, as to the response, "I can lose my life,"
        that shall be struck from the record. You are to disregard that statement.

Q. Do you have concerns for your personal safety as a result of testifying?

A. Yes.

COURT: Sidebar.

The jury was left with the impression that N.F. was not a paid informant for

the F.B.I. and that she had not been intimidated by officers to change her testimony.

The Petitioner should have been able to call Officer Condon to correct the record:

that N.F. was a paid informant, how much she had been paid, that they stopped

paying her after her deposition, and that the Supervisor of the F.B.I. office in

Springfield was "upset" with her because of her involvement in this case.  S.A.

II/005.

A prosecutor has a duty to correct testimony he or she knows to be false, even

if its introduction was not knowing and intentional. *Bracy v. United States*, 435 U.S. 1301, 1302 (1978), *citing Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959).

## Conclusion

The Petitioner requests that the Court order his release from custody unless he is afforded a new trial.

Respectfully submitted,
Phillip Ayala
By his attorney

/s/ Janet Hetherwick Pumphrey
Janet Hetherwick Pumphrey
BBO # 556424
17 Housatonic Street
Lenox, MA 01240
(413) 637-2777
JHPumphrey@gmail.com

## Certificate of Service

I, Janet Hetherwick Pumphrey, certify that the above document will be served upon any party or counsel of record who is not a registered participant of the Court's ECF system, upon notification by the Court of those individuals who will not be served electronically.

/s/ Janet Hetherwick Pumphrey
Janet Hetherwick Pumphrey

October 9, 2009