UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PHILIP AYALA,

    Petitioner,

    v.

SUPERINTENDENT SEAN MEDEIROS,

    Respondent.

Civil Action No. 20-30059-MGM

MEMORANDUM AND ORDER REGARDING
PETITION FOR WRIT OF HABEAS CORPUS
(Dkt. No. 1, 23)

October 27, 2022

MASTROIANNI, U.S.D.J.

## I.   OVERVIEW

Philip Ayala ("Petitioner") was convicted of first-degree murder based on the testimony of one eyewitness, Robert Perez. Mr. Perez identified Petitioner as the individual who shot and killed Clive Ramkissoon outside an illegal, after-hours Springfield house party on June 10, 2007. The Commonwealth introduced no other direct evidence but did present circumstantial evidence that Petitioner attended the same party, was not allowed in because he refused to be searched or pay the cover charge, said he would "light this place up" or "shut the party down," kicked in the front door, and was distressed and angry that the party was occurring close to the scene where his young niece had recently been shot and killed. The case turned on the testimony and credibility of Mr. Perez, whom the Commonwealth described, in exchanges with the trial court preceding Mr. Perez's testimony, as "the only Commonwealth witness" and "the key Commonwealth witness." (Assistant District Attorney: "Mr. Perez is it.")

Defense trial counsel knew Mr. Perez's identification of Petitioner was essential to the Commonwealth's case. Defense counsel also knew generally, from the Commonwealth's discovery produced some time after January 24, 2008, that Mr. Perez had been diagnosed with post-traumatic stress disorder which he treated with regular therapy sessions at the Northampton Veterans Affairs Medical Clinic ("Veteran's Hospital") between 2000 and 2008. However, defense trial counsel failed to request that the court subpoena Mr. Perez's mental health treatment records from the Veteran's Hospital until the first day of Petitioner's trial. The Veteran's Hospital responded to an incorrect subpoena request and produced a very short 38-page file of medical (but not mental health) records. The produced material showed Mr. Perez's medical lab results, complaints of asthma, and requests to use the exercise facilities, without any progress notes for his therapy sessions, evaluations from his psychiatric hospitalization, or psychological assessments. Defense trial counsel realized the production had erroneously excluded Mr. Perez's psychological and psychiatric records but did nothing to correct the omission. Petitioner's appellate counsel later obtained the omitted mental health records after the trial.

The omitted psychological and psychiatric records, which amounted to hundreds of pages, portray Mr. Perez as suffering from PTSD symptoms—including paranoia, flashbacks, hypervigilance, and intrusive thoughts—for the seven years preceding the shooting, within hours of witnessing the shooting, and for years following the shooting. The omitted psychological and psychiatric records also describe the source of Mr. Perez's original trauma—an accidental shooting in which Mr. Perez killed a man in Germany during military service. The psychological records show Mr. Perez recounting numerous factual similarities between his memories of the German shooting incident and his memories of Mr. Ramkissoon's shooting death. Progress notes from an "emergency" visit to his therapist the day after Mr. Ramkissoon's shooting document Mr. Perez suffering flashbacks and show him already connecting his memories of Mr. Ramkissoon's shooting and the German shooting.

Records from Mr. Perez's psychiatric hospitalization in 2007 show how Mr. Perez's memories of the Army shooting and Mr. Ramkissoon's shooting triggered severe PTSD symptoms, including symptoms that could have affected his percipient abilities, and ability to accurately recall. A psychiatric expert who reviewed, post-conviction, Mr. Perez's psychological records testified: "Mr. Perez was suffering from post[-]traumatic stress symptoms prior to, during, and after" witnessing Mr. Ramkissoon's shooting and "these mental health or emotional conditions had the potential to and may have interfered with Mr. Perez's ability to accurately perceive and recollect" the shooting. The psychiatric expert also testified Mr. Perez "link[ed]" the German shooting and Mr. Ramkissoon's shooting and "[r]e-experiencing a traumatic event in the form of a flashback and/or memories increases the level of emotional reactivity and can affect perception of reality and recall."

The jury in Petitioner's trial, however, knew none of this context when considering Mr. Perez's testimony because of defense trial counsel's failure to obtain the psychological and psychiatric records, despite recognizing their omission from Mr. Perez's Veteran's Hospital file. The jury was also deprived of the benefit of expert testimony from a psychiatrist as to how Mr. Perez's PTSD symptoms may have influenced, distorted, or affected his perception and recollection of Mr. Ramkissoon's shooting. Without reference to details from the psychological and psychiatric records to support his motion for an expert, defense trial counsel could not convince the trial court that such testimony was even relevant. The jury relied on Mr. Perez's testimony that he saw Petitioner's face illuminated in the muzzle flash from the gun as it was fired at Mr. Ramkissoon. On this basis, the jury convicted Petitioner of first-degree murder.

The Supreme Judicial Court ("SJC"), on direct appeal, denied Mr. Ayala's ineffective assistance of counsel claim for trial counsel's failure to obtain the psychological records. The SJC held: "Because the substance of the missing records and proffered [psychological] expert testimony was already presented to the jury, any error on the part of trial counsel in failing to notice the missing records was

not likely to influence the jury's conclusion." *Commonwealth v. Ayala*, 112 N.E.3d 239, 256 (Mass. 2018). But the substance of the missing psychological records clearly was not presented to the jury, and those critical records were not available for any pretrial purposes including review by Petitioner's proffered psychological expert, the trial court, or the trial court's own designated examiner.

This court holds the state court's adjudication of Petitioner's ineffective assistance of counsel claim on the basis of the missing psychological records was "based on unreasonable findings of facts" under 28 U.S.C. § 2254(d)(2) and, furthermore, adjudication of this claim "resulted from an unreasonable application of clearly established federal law" under the Sixth Amendment to the U.S. Constitution and *Strickland v. Washington*, 466 U.S. 668 (1984). *See* § 2254(d)(1). Defense counsel's failure to obtain the psychological records and consequential failure to introduce expert testimony as to any effect Mr. Perez's PTSD may have had on his percipient and recall abilities amounted to unconstitutionally deficient performance "sufficient to undermine [this court's] confidence in the outcome" of Petitioner's trial. *Strickland*, 466 U.S. at 694. This court therefore grants Petitioner habeas relief "on the ground that [he] is in custody in violation of the Constitution . . . of the United States." *See Shoop v. Twyford*, -- U.S. --, 142 S. Ct. 2037, 2043 (2022) (quoting 28 U.S.C. § 2254(a)).

The court further holds, however, that the SJC's determination on the sufficiency of the evidence actually presented at trial was not unreasonable, and, therefore, Petitioner may be retried without running afoul of the Double Jeopardy Clause. *See Burks v. United States*, 437 U.S. 1, 18 (1978) (holding Double Jeopardy Clause requires judgment of acquittal where reviewing court finds evidence legally insufficient). The court declines to reach the habeas petition's remaining grounds (*see* Dkt. No. 23 at 1-4), as "any relief [Petitioner] could obtain on th[ose] claim[s] would be cumulative." *Banks v. Dretke*, 540 U.S. 668, 689 n.10 (2004) (granting habeas on *Brady v. Maryland* claim and declining to reach ineffective assistance claim).

The writ shall conditionally issue. The court orders Petitioner released if the Commonwealth

does not retry him within 120 days from the date of this decision.

## II.   FACTUAL BACKGROUND

The facts underlying Petitioner's conviction are drawn from the SJC's decision, *Commonwealth v. Ayala*, 112 N.E.3d 239 (Mass. 2018), and supplemented with other, consistent record facts, all of which were presented to the state court.[1] *See Healy v. Spencer*, 453 F.3d 21, 22 n.1 (1st Cir. 2006) ("[O]ur precedent makes clear that we may at least consider other facts from the record consistent with the state court's findings . . . and furthermore here the SJC said explicitly it had considered the entire trial record." (internal citation omitted)). The court recognizes the deference owed the state court findings, but the brevity of the SJC's decision and the importance of many omitted record facts have made extensive supplementation necessary.

### A.   THE SHOOTING

Early on the morning of June 10, 2007, Robert Perez and Clive Ramkissoon attended an after-hours house party at a duplex at 334 Wilbraham Road in Springfield, Massachusetts. Mr. Perez and Mr. Ramkissoon, friends from work, had been hanging out that evening at another friend's house and a bar. Around 1:30 a.m., Mr. Ramkissoon and Mr. Perez met a woman on the street who invited them to a party. The woman, Quadishia Simms, got into Mr. Ramkissoon's truck and directed Mr. Ramkissoon and Mr. Perez to 334 Wilbraham Road. (R.A. 16-16 at 75–76; 16-17 at 21–24.) As they approached the house, Mr. Perez twice expressed concern about the safety of the neighborhood and suggested they turn around. (R.A. 16-16 at 79.) His companions ignored him, and Mr. Perez, Mr. Ramkissoon, and Ms. Simms arrived at the Wilbraham house party at about 2:00 a.m. They were

---

[1] In this decision, the "Record Appendix" are the transcripts filed by Respondent as Response/Answer to Habeas Corpus Petition at Dkt. No. 16 and are referred to as "R.A. 16-1," "R.A. 16-2," *etc.* "Supplemental Appendix I" ("S.A.I") refers to the document filed by Respondent at Dkt. No. 20, and "Supplemental Appendix II" ("S.A.II") refers to the document filed by Respondent under seal at Dkt. No. 22. The court uses the pagination automatically generated in the document header by the electronic CM/ECF database.

searched by a female bouncer at the front door of the house then directed to the second floor where a second bouncer collected a $5 entry fee. Mr. Ramkissoon bought Mr. Perez a beer. (R.A. 16-17 at 27–28.) There were few attendees at that hour, and Mr. Perez returned downstairs to speak to the bouncer at the front door. Petitioner Philip Ayala arrived at the party soon after, and he refused to be searched by the female bouncer. Petitioner argued with the bouncer, pushed past her, and continued up the stairs, past Mr. Perez, to the second floor. This was the first time Mr. Perez ever saw Petitioner. The second-floor bouncer, however, would not let Petitioner in without being searched and paying the entry fee. Petitioner refused and was sent back downstairs, passing Mr. Perez in the stairwell a second time. Mr. Perez heard Petitioner shout that he was going to "be back" and "light this party up" before he left the house. (R.A. 16-17 at 34–36, 38.) (The first-floor bouncer testified that Petitioner "said he was going to shut the party down." (R.A. 16-17 at 143.))  Shortly after leaving, Petitioner returned to the front door and kicked it, leaving a shoeprint, and then departed a second time.

Mr. Perez, primed by his concern about the neighborhood's safety, was so startled by the sound of the door being kicked in that he decided at once to leave. Mr. Perez did not see who kicked in the door, but he believed it was Petitioner. Mr. Perez went upstairs to find Mr. Ramkissoon. Mr. Perez and Mr. Ramkissoon stepped onto the second-floor balcony to look for Petitioner, whom Mr. Perez saw pacing outside. (R.A. 16-17 at 34–35, 38–39.) It was based on these two passings in the stairwell, Mr. Perez testified, that he was able to sufficiently recall Petitioner's facial features to identify him from the distance of a two-story balcony to the ground at night and later illuminated in the muzzle flash from a firearm during the shooting incident. (R.A. 16-17 at 35–37.) Mr. Perez could not "exactly recall" what Petitioner wore that night, and his description of Petitioner's clothing changed several times.[2] (R.A. 16-17 at 34.)

---

[2] Mr. Perez's June 10, 2007 police statement describes Petitioner as wearing "a matching coat and pants set" of unspecified color or description; Mr. Perez also states the shooter "was wearing the same exact outfit as the guy from the stairwell" without explaining what that outfit was. (S.A.II 455, 457.)

Mr. Perez and Mr. Ramkissoon decided to wait for a few minutes to avoid the agitated person they had seen from the balcony. Ms. Simms was also ready to leave; she had been kicked out of the party for her apparently drunken behavior of undressing and dancing provocatively. (R.A. 16-17 at 32.) Mr. Perez, Mr. Ramkissoon, and Ms. Simms exited 334 Wilbraham Road and began walking across Wilbraham Road toward Mr. Ramkissoon's truck.

Mr. Ramkissoon had parked on Bristol Street east of 334 Wilbraham Road, close to Bristol's intersection with Wilbraham Road. (R.A. 16-17 at 25, 40–42.) The house at 334 Wilbraham abutted Colonial Avenue to the west and another residence, 338 Wilbraham, to the east. (R.A. 16-17 at 152, 159.) Across from 334 Wilbraham was a church and a parking lot, and across from 338 Wilbraham was a market/deli occupying the corner of Wilbraham and Bristol. (S.A.I 384.) Mr. Perez bent down to tie his shoelace, and Ms. Simms and Mr. Ramkissoon kept walking, leaving a gap between them and Mr. Perez. (R.A. 16-17 at 40.) Ms. Simms stopped on the double yellow lines dividing Wilbraham Road and began dancing while cars drove around her. (R.A. 16-17 at 42.) Mr. Perez tried to escort Ms. Simms out of the road. While Mr. Perez stood in the middle of Wilbraham Road, he heard gunshots coming from the direction of the house east of 334 Wilbraham Road. (R.A. 16-16 at 88–89.) Mr. Perez saw muzzle flash from a gun being discharged, and in the illumination from the flash, Mr. Perez saw Petitioner's face. (R.A. 16-16 at 89–90.) Petitioner was standing under an aluminum pole street lamp near 338 Wilbraham's easternmost property line. According to testimony from a police officer, the street lamp was illuminated when the officer arrived at the scene about 4:30 a.m. (R.A. 16-17 at 162–

---

Sometime between January 25, 2008 and June 16, 2009 while he was incarcerated, Mr. Perez wrote to the ADA that the shirt Petitioner wore to his arraignment (which Mr. Perez apparently attended) was the same shirt Petitioner wore on the night of the shooting, although Mr. Perez did not provide any description of the shirt to explain how he made the connection. (S.A.II 493; R.A. 16-17 at 78.) At trial on August 19, 2009, Mr. Perez gave two different descriptions of Petitioner's clothing: "a white T-shirt and a matching shorts" (R.A. 16-17 at 34) and "a white T-shirt or a green T-shirt with kind of a skull on it . . . and also some shorts, but I don't recall the color . . . it seemed to be a matching set" (*Id.* at 58).

63.) Mr. Perez could not recall whether the street light was illuminated at the time of the shooting but he indicated he was certain he saw Petitioner's face lit by the firearm's muzzle flash. Mr. Perez identified the weapon being fired as a .22 caliber firearm based on his familiarity with the sound. He did not specify the number of muzzle flashes he observed. (R.A. 16-16 at 89–90; R.A. 16-17 at 45.) Mr. Perez heard a total of five to seven shots and took off running, leaving Ms. Simms in the street. (R.A. 16-17 at 47–50.) Mr. Perez ran across Wilbraham Road and jumped over a tall fence surrounding the church toward the church's parking lot. (R.A. 16-17 at 50.) Mr. Perez then returned to Bristol Street near the intersection with Wilbraham Road, where he saw Mr. Ramkissoon shot and lying on the ground. (R.A. 16-17 at 50–51; S.A.I 384.) Mr. Ramkissoon was bleeding and had broken his teeth when he fell to the concrete. (R.A. 16-17 at 51–52.) Mr. Perez tried to clear Mr. Ramkissoon's airway, then flagged down a car to call 911. (*Id.*) Paramedics arrived at approximately 3:00 a.m. and transported Mr. Ramkissoon to the hospital where he was pronounced dead from multiple gunshot wounds.

Mr. Perez was taken to the Springfield police station where he gave a statement describing "a tall light[-]skinned black male, possibly Hispanic but I think he was black, about 6'0" to 6'1" wearing a matching coat and pants set with a short faded haircut. He was about 20-30 years old and he was kind of muscular about 180-200 lbs. He may have had a diamond stud in his ear and a thin goatee." (S.A.II 455; R.A. 16-17 at 68–69.) Mr. Perez's statement continued, "I got a brief glimpse at this male subject as he fired the gun and he was wearing the same exact outfit as the guy from the stairwell. I was also able to quickly see his face but he was a little bit away from me, but I am sure it was the same guy who had been in the stairwell and had the problem about being frisked. In my mind, it was the same guy, I am positive." (S.A.II 457.) Mr. Perez also identified Petitioner from a photographic line-up as the person who had not wanted to be searched by the first-floor bouncer at the party and who had shot Mr. Ramkissoon. (Upon identifying Petitioner's photograph, "Det[ective] Prior told [Mr. Perez] that the person who[m he] picked out from photo #3 is actually identified as a Philip Ayala,

D[O]B 6/28/72 SS#[redacted] from 75 Sherman St. Springfield Ma." (S.A.II 458.)) On July 10, 2007, Mr. Perez testified before a grand jury and amended his description of the shooter as closer to 5 feet 10 inches but otherwise endorsed his police statement, which the Assistant District Attorney read into the record. (R.A. 16-17 at 56–57; S.A.I 347.)

B.   THE TRIAL

At trial, Petitioner was represented by assigned defense counsel Gregory Schubert ("defense counsel"). On the first day of jury selection, August 12, 2009, the Assistant District Attorney (the "ADA") told the court and defense counsel that Mr. Perez had been served his trial testimony subpoena at the Veteran's Hospital in Leeds, Massachusetts. (R.A. 16-13 at 4–5.) Defense counsel expressed concern that he needed time to subpoena and review any psychological records for Mr. Perez before conducting cross-examination "to avoid an IAC [ineffective assistance of counsel claim] . . . since [Mr. Perez] has a documented history, and I assume he's back at Leeds for his PTSD relative to his being the only eyewitness that places my client at the scene of the shooting." (R.A. 16-13 at 5–6.) Defense counsel moved for an order subpoenaing Mr. Perez's psychological and psychiatric records, which the Commonwealth did not oppose. Defense counsel had known from discovery produced by the ADA sometime after January 24, 2008 that Mr. Perez had received psychological counseling for PTSD at the Veteran's Hospital regularly since April 14, 2000. (S.A.II 10–15; R.A. 16-15 at 26; R.A. 16-16 at 100.)

Defense counsel and the trial court also considered the psychological records pertinent to the question of Mr. Perez's competency to testify.

Defense counsel:    [W]e don't know whether he's delusional at this point in time.

Trial court:    We have to find out. These records have to be – I'm going to allow the motion. No objection by the Commonwealth.

(R.A. 16-13 at 138–39.)

The District Attorney's office prepared a proposed order for defense counsel's motion, which the trial court signed on August 13, 2009. The order erroneously excluded all psychological and psychiatric records from the demanded production and requested only medical information. It stated, in full:

> It is hereby ordered that KEEPER OF THE RECORDS at Veteran's Hospital, 421 North Main Street, Leeds, MA, release to the SUPERIOR COURT CLERK'S OFFICE, any and all medical records regarding the treatment of Robert Perez, treated on or about 2009. This order does not include psychiatric, psychological or social worker records.
>
> It is further ordered that the Superior Court Clerk's Office release copies of said records to all counsel of record upon receipt. The person on whom medical records are being requested is the witness in a criminal case. This order does not authorize the release of psychiatric or mental health records.

(S.A.I 327.)  After the subpoena was served, on August 14, 2009, the ADA brought the error to the court's attention and presented a revised order, which the trial court also signed. (R.A. 16-15 at 24–25.) The revised order read, in full:

> It is hereby ordered that the KEEPER OF THE RECORDS at Veteran's Hospital, 21 North Main Street, Leeds, MA release to the SUPERIOR COURT CLERK'S OFFICE, any and all medical, psychiatric, psychological or social worker records regarding the treatment of Robert Perez, treated on or about 2009.
>
> It is further ordered that the Superior Court Clerk's Office release copies of said records to all counsel of record upon receipt. The person on whom the medical, psychiatric, psychological or social worker records are being requested is the witness in a criminal case.

(S.A.I 328.) The revised order was signed on August 14, 2009 according to the trial court docket in Petitioner's case, but responsive psychological and psychiatric records were never produced to the clerk's office during Petitioner's trial. (S.A.I 134.) It appears records responsive to the revised order were not received in the clerk's office until February 11, 2014, after post-conviction defense counsel re-served the trial court's August 14, 2009 order. (S.A.I 37, 39, 139.)

On August 17, 2009, the trial court declined a joint request to delay the trial until the records had been received and reviewed. (R.A. 16-15 at 28 ("I don't see anything that's going to prejudice

anyone at this juncture to start the trial.").) Defense counsel notified the court he intended to move for a competency evaluation based on Mr. Perez's diagnosis of PTSD and his current residence at the Veteran's Hospital. (R.A. 16-15 at 26 ("I know for sure that it would be ineffective assistance of counsel if I didn't demand some kind of hearing or evaluation to find out whether or not he's even competent to give testimony in this case.").) The trial judge echoed defense counsel's suggestion: "When the records are revealed to all of us, I may sua sponte [issue] a decision respecting his testimony." (R.A. 16-15 at 28.)

While both sides waited for the Veteran's Hospital to produce Mr. Perez's records, the Commonwealth presented testimony from Sergeant David Martin, Springfield Police Department, who responded to a report of gunfire on Wilbraham Road and found Mr. Ramkissoon lying on Bristol Street. (R.A. 16-15 at 91–92.) Next the Commonwealth called Joann Richmond, a forensic pathologist/medical examiner, to testify as to Mr. Ramkissoon's autopsy. Dr. Richmond testified Mr. Ramkissoon died of multiple gunshot wounds, "particularly the one that went through the lung and the heart which caused bleeding," which had entered Mr. Ramkissoon's body through the back of his left arm. (R.A. 16-15 at 125.) After Dr. Richmond testified, the trial court released the jury for the day about thirty minutes early and informed the parties that Mr. Perez's records from the Veteran's Hospital had arrived and could be examined only in the court clerk's office. (R.A. 16-15 at 131, 136, 138.) (However, these were incomplete, as they did not include any psychological or mental health records. (S.A.I at 37.)) The trial court stated it planned to ask the jury to return at 9:30 a.m. the following day, rather than 9:00 a.m., to allow the parties extra time to review the records. (R.A. 16-15 at 131.) The trial court held off deciding whether to order Mr. Perez, who was scheduled to testify next, to undergo a competency exam "depend[ing] on the requests or my own motion that there should be an examin[ation]." (R.A. 16-15 at 138.)

The 38-page file of Mr. Perez's medical records actually produced in response to the erroneous subpoena and relied upon at trial did not include any psychological or psychiatric records. On August 18, 2009, the trial court began with a sidebar discussion about the Veteran's Hospital records and defense counsel's motion for Mr. Perez to undergo a competency exam. Defense counsel knew the 38-page file produced on August 17 did not contain psychological counseling notes corresponding to the list of over one hundred counseling appointments produced by the ADA in discovery. In fact, defense counsel told the trial court "those records cannot in any way, any possible fashion, shape or form be complete." (R.A. 16-16 at 59; *see also* R.A. 16-16 at 51 (noting lack of psychological reports or testing supporting Mr. Perez's diagnoses).) But defense counsel did not petition the court for any type of action to confirm whether the records were complete, move for a continuance to obtain the omitted records, or do anything else to "follow up," because, as he explained in an affidavit several years after the trial, "I was busy and distracted by other matters. The missing mental health records slid off my radar." (S.A.I 463–64). The trial court and the prosecution inaccurately inferred that the lack of psychological entries or information in the 38-page file demonstrated Mr. Perez's lack of mental health problems. The ADA said, "I really didn't see anything that jumped out at me that suggested that he was not competent." (R.A. 16-16 at 8.) The ADA continued, "It appears that the biggest thing that he has going there is the exercise program that they want him to participate in . . . ." (R.A. 16-16 at 8–9.) The trial court stated, "I read the records page by page. . . . There's nothing salient about that record that told me he is incompetent to testify." (R.A. 16-16 at 9.) Defense counsel moved for a competency exam based on the fact Mr. Perez "is bipolar with manic expressions thereof and . . . there's nothing that says what [medication] he's taking relative to his bipolar situation" in the 38-page file of medical-only records. (R.A. 16-16 at 5.) Between August 17 and 18, 2009, defense counsel had consulted briefly with a potential psychological expert, Dr. Ebert, who "explained to me that a person that is manic obviously is wired high and if he's not on his medications, obviously he doesn't believe he would be

competent to testify." (R.A. 16-16 at 5.) The trial court allowed defense counsel's motion for a competency examination "[b]ased on a medical record that has a regime of medication" and Mr. Perez's diagnoses of PTSD and bipolar disorder. (R.A. 16-16 at 10.)

The trial court's reasoning and its intended purpose for the court-ordered competency examination are, at times, complicated to follow. The trial court recognized the importance of determining both Mr. Perez's competency to testify and his percipient abilities at the time of the shooting. (R.A. 16-16 at 9–12.). The trial court combined the two inquiries and attempted to use the competency examination for both purposes. What is clear from the record, however, is the substance of Mr. Perez's 38-page Veteran's Hospital file—which did not include psychological notes or psychiatric hospitalization records—influenced the trial court's decision and defense trial counsel's motion for an expert witness. (*See, e.g.,* R.A. 16-16 at 60–64.)  The trial court stated:

> [W]hat we need to determine . . . is, one, is he competent to express to this jury the percipient facets of his mind that he was able to use in making observations, allegedly, that Mr. Ayala is the person who shot that gun. Now that level of competency is critical.

(R.A. 16-16 at 10.) The trial court then implied the competency examiner was qualified and able to answer both the question of Perez's present competency to testify and any effect his mental illnesses had on his percipient abilities on the day of the shooting. (R.A. 16-16 at 10–12, 15 (seemingly interchangeably discussing both issues); *see also* R.A. 16-16 at 23 (trial court: "[The competency examiner] knows what a competency exam is and he'll be inquiring about whether or not [Mr. Perez] knows the difference between truth and falsity, and whether or not this doctor can cognitively determine whether there's a percipient problem . . . .").) The trial court further stated: "The real issue here is whether or not his percipient abilities are affected by a condition he has and were affected by it at the time that he made these alleged observations." (R.A. 16-16 at 12.) But a few moments later, the trial court opined: "What this really redounds to . . . is simply[,] is he competent to testify." (R.A.

16-16 at 15.) Clearly, the trial court was struggling, under the circumstances it was presented with, to fashion a fair approach to the issues of competency and percipient ability.

The competency examiner, Dr. Burke, concluded Mr. Perez was competent to testify. (R.A. 16-16 at 45 ("To clarify, I did an evaluation . . . for competency to testify.").) The trial court also asked whether Dr. Burke "inquire[d] what [Mr. Perez's] condition was" in June 2007, at the time of the shooting. Dr Burke responded:

> The Court was interested in that. I briefly asked him about that. . . . And he told me at that time he was not on any medications . . . and he was feeling, prior to the incident, okay. He was with friends and he wasn't suffering from symptoms of a mental illness at that time.

(R.A. 16-16 at 47.) Dr. Burke appears to have relied entirely on Mr. Perez's self-report in his "brief[]" inquiry on the issue of Mr. Perez's percipient abilities on the date of the shooting (lacking access, as did the trial court and defense counsel, to Mr. Perez's psychological records).

Defense counsel then moved for permission to introduce testimony from an expert psychologist. In arguing for expert testimony, defense counsel simply opined that the 38-page Veteran's Hospital file could not possibly be complete since it lacked any evaluations or supporting psychological notes for Mr. Perez's diagnosed mental illnesses. (R.A. 16-16 at 51, 59.) The trial court reserved ruling on the motion for expert testimony until after Mr. Perez's testimony, but expressed serious doubt. (R.A. 16-16 at 48–68.) The lack of documented psychological symptoms and illness in Mr. Perez's file—what the trial court refers to as "foundation"—was critical to the trial court's reluctance to allow expert testimony and its ultimate ruling denying it. (R.A. 16-16 at 64 ("No evidence in the medical records or anything else.").) The absence of psychological data in Mr. Perez's Veteran's Hospital medical file had the perverse effect of obscuring, for the trial court, the need for psychological

expert testimony to explore any effect Mr. Perez's PTSD symptoms had on his percipient, recollection, and recall capabilities. This percipient ability is the very issue the trial court had noted.[3]

Defense co-counsel pressed for expert testimony from a psychiatrist:

[T]o boost the defense's position about what [Mr. Perez's] mental condition was more likely than not, or probably, on June 10, 2007, based on the circumstances that we already heard put into testimony—his physical position next to the deceased, the officers coming upon the scene, that they see physical vomiting, etc.—all of that can only be done . . . with both the adequate cross-examination setting the stage for that and then the psychiatrist . . . being able to tell a jury based on his professional credentials what his opinion would be.

(R.A. 16-16 at 53.) The trial court commented at length on this issue. (*See, e.g.,* R.A. 16-16 at 10–11, 13–14, 53–55.) Of particular relevance, the trial court stated:

I don't think it r[ises] to the level of just bringing in an expert now and testifying as to what he would opine regarding how [Mr. Perez] conducted himself or what his percipient qualities were on that particular day if there's no foundation laid that he was suffering from that disease on that day.

(R.A. 16-16 at 55.) The court continued:

[Mr. Perez] can be cross-examined about what his mental state was on that particular day. That does not give rise to a doctor coming in here, in my view, and opining that's not what his mental state was on that day because it not only would be speculative, it would be based on close to zero foundation other than the jury getting some benefit of knowing the definition of bipolar disease.

(R.A. 16-16 at 58.)

The trial court expressly connected the lack of documented mental health symptoms in the 38-page file to its analysis:

It comes down to this person, albeit not manifested today, allegedly suffering from a mental disorder known as bipolar disorder, whether or not that particular disorder affected his percipient capacity so he can testify with whatever degree of accuracy this jury needs to know about.

Now, you want an expert to come in here and opine that he could not do that or might not . . . in the case most favorable to the defendant, you want an expert to come in

---

[3] The ADA also recognized the potential importance of the psychological records to evaluating Mr. Perez's percipient abilities. (R.A. 16-13 at 138 (Referring to Mr. Perez's diagnosis of PTSD, the ADA said, "[C]learly it's the type[] of thing[] that affect[s] the ability to perceive or possibly could do so.").)

and opine that based on the bipolar disease, . . . that this individual could not possibly have perceived the events that it just testified to occurred.

[H]ow, is the doctor going to possibly do that, unless for some reason he's going to say that bipolar disease affected your ability to see certain things because you [en]vision things of this nature.

Even if he says that, where's the evidence that any of those visions or things were seen, and you're not going to hear anything in that regard unless Mr. Perez tells me that's what he saw [on cross-examination].

(R.A. 16-16 at 66–67.) The trial court noted non-mental-health problems were far more prevalent in

the 38-page file than mental-health problems:

You could have [*sic*] rhinosinusitis that [Mr. Perez] had that might have affected his abilities more than bipolar. He might have had blurred vision. . . . That's more prevalent on these records, more salient than bipolar disease. . . . I find it a quantum leap for me to have an expert come in here and say: This is the way [Mr. Perez] was thinking and this is the way he was percipient on that June date. . . . You're not going to get that. No evidence in the medical records or anything else.

(R.A. 16-16 at 61–62, 64.) Defense counsel could not effectively argue for expert psychological

testimony since he could not, without the missing psychological records, address or correct the trial

court's conclusion that there was "[n]o evidence in the medical records" of Mr. Perez suffering from

PTSD symptoms at the time of the shooting. (R.A. 16-16 at 64.) Very simply, the trial court's analysis

was not informed by the mental health records that the prosecution, the defense, and the trial court

had indicated were necessary documents to review. The trial court stated:

[T]he mental state . . . of Mr. Perez is not on trial. His percipient capacities are on trial. Rhinosinusitis may affect percipient capacities more than bipolar disease and post[-]traumatic stress disorder. . . . Are we to get an expert on pulmonary diseases?

(R.A. 16-16 at 67–68.)

Right before Mr. Perez testified, the Commonwealth raised an issue about Mr. Perez's military

duties—the significance of which would have been clear had defense counsel obtained Mr. Perez's

psychological records, but in their absence, was not. The ADA stated Mr. Perez's military duties had

16

been classified, and Mr. Perez was not able to discuss them.[4] (R.A. 16-16 at 68–69 (referring to S.A.II at 42).) The actual mental health records make clear why the military interaction needed to be discussed in the setting of a fair trial. Defense counsel's exchange with the trial judge regarding the classified issue illuminates the problems attributable to a lack of complete records. Specifically, defense counsel noted that in the incomplete 38-page file from the Veteran's Hospital, "[Mr. Perez] refuses to divulge . . . what his military history is. [The proposed defense expert] says that it's very, very confusing because frequently people that are bipolar and manic see themselves in a reality that does not exist. [Mr. Perez] may believe he's James Bond and it appears he may see realities that we don't see. . . [H]e says that he's in the Army, [and] he says [it's] classified. We don't know." (R.A. 16-16 at 5–6.) The trial court gleaned no import to the point: "The record respecting his military duties is silent with the exception of the fact that it[] . . . simply say[s] 'not disclosed' or 'classified,' I think was the word that was used. . . . As to whether or not it's relevant to this case, this is a percipient witness. Am I not getting my point across?" (R.A. 16-16 at 10, 69). Again, the trial court's reasoning was not informed by the very mental health records necessary to ensure its soundness.

*Testimony of Robert Perez*

On August 18, 2009, Mr. Perez testified he had served in the Army for two years before being honorably discharged "under hardship conditions," which he testified referred to his mother's poor health. (R.A. 16-17 at 8.) He made no mention of the details of his Army service, which were key to assessing his credibility and percipient ability. Those details and the effect of Mr. Perez's service on his mental health were contained in the psychological records from the Veteran's Hospital and,

---

[4] The issue about classified information—and the accuracy and source of that categorization—was not developed at trial or in the appeal. No government motion was filed to claim any applicable relief or privilege or to state any basis for counsels' belief the service was indeed "classified." It is not clear how much of the military service detail the ADA, defense counsel, and the trial court were actually aware of.

therefore, never produced to the trial court, prosecutor, or defense trial counsel during trial and unknown at the time of Mr. Perez's testimony. He had criminal convictions for unarmed robbery, larceny, and violation of probation and had recently been released from prison. (R.A. 16-16 at 73–74.) Mr. Perez then described the night of June 9 and early morning of June 10, 2007. At the conclusion of Mr. Perez's direct testimony, the trial court dismissed the jury for the day and addressed defense counsel's motions (1) for a continuance to cross-examine Mr. Perez, (2) for funds to consult a psychological expert, and (3) to introduce expert psychological testimony. The trial court denied defense counsel's motion for expert testimony based on its own impression of Mr. Perez's credibility:

> The Court has listened to the direct testimony only, obviously, of this particular witness and as a result of my hearing and observations, I find that the subject issue respecting any imperfections mentally or otherwise is being made somewhat more clear in that I easily discerned from my observations and my hearing that there was no[t] one scintilla of vagueness, lack of clarity, anything incomprehensible or anything other than detailed testimony which helps me resolve part of the issue . . . that I've been presented with [by defense counsel].

> In that regard, the first request was that I allow [defense counsel] to have time to digest the testimony based on previously referenced dialogue the Court has had as well as previous issues so that he be able to prepare himself for cross-examination tomorrow. It's obvious to anyone in this courtroom that I allowed that request.

> The second request is really coupled with . . . a third request. The second was . . . a motion for a psychological expert which is for [defense counsel to] be[] able to . . . acquire[] certain funding so that he might be able to be assisted in his cross-examination.

> In support of that motion, [defense counsel] presented to this Court that he was not cognizant of what, if any, imperfections[,] mental instabilities, mental diseases, or anything of that nature that is alleged to pertain to the witness until most recently by virtue of documents that he examined which bore out certain things, and by virtue of, frankly, information being provided to him by the district attorney . . . .

> The second level of that second request is that he would ask this Court to consider expert testimony in the medical discipline that's been the subject of our concern.

> Let me start at the end. Unless something countervailing and compelling in cross-examination emerges, this Court will not be allowing an expert to testify in the v[ein] requested by the defense.

> This Court is, however, going to allow the motion for funds to [defense counsel] to be able to consult this evening, or whenever he so desires, prior to commencement of cross-examination tomorrow morning and for those purposes only.[5]

(R.A. 16-16 at 98–101.) Although the trial court did not, as part of its oral ruling, address the lack of support in Mr. Perez's Veteran's Hospital file for significant psychological or psychiatric symptoms, it is obvious that the paucity of Mr. Perez's 38-page medical file played a significant role in the trial court's decision to deny expert testimony. The missing psychological records did, in any event, hamstring trial defense counsel from effectively arguing for admission of expert psychological testimony, and following the trial court's oral ruling, defense counsel did not even try to do so. The missing records put the trial judge in the unknowing position of ruling on motions without having correct and full contextual information.

The next morning, August 19, 2009, defense counsel cross-examined Mr. Perez. The trial court, sua sponte, constrained defense counsel's questioning related to Mr. Perez's PTSD: "I'll permit him to answer what his own understanding [of PTSD is], and then we're moving on." (R.A. 16-17 at 10.) This ruling essentially designated Mr. Perez to evaluate himself and left the jury without the benefit of contradictory information contained in Mr. Perez's psychological records, which he did not mention in his self-assessment. Mr. Perez testified:

> Post-traumatic stress disorder is when you are in an environment with combat or a traumatic experience and that experience stays with you and either you can have different types of symptoms such as night terrors, anxiety, hypervigilance, and it's just a re[-]occurring situation.

(R.A. 16-17 at 11.) When asked how PTSD affected him "personally," Mr. Perez testified:

> My PTSD does not affect me person-- . . . my military PTSD was under control. While I was going to counseling, I was working; I was being productive. And so the effect that it had on me was minimal. It's just basically, in an essence, remembering a bad

---

[5] Defense counsel's expert, of course, based any advice he gave on his review of Mr. Perez's 38-page medical file, which did not include any psychological records.

time, a bad dream, a bad situation, and I was already past that point. I had gone through my counseling; I had done the steps that I needed to do to get myself better.

(R.A. 16-17 at 11–12.) Defense counsel asked Mr. Perez about the frequency and regularity of his counseling sessions, referring him to a list of 161 counseling appointments[6] at the Veteran's Hospital between April 14, 2000 and January 18, 2008, which had been produced by the Commonwealth during discovery, sometime after January 25, 2008. (R.A. 16-17 at 13; S.A.II 10–15.) In response, Mr. Perez downplayed the sessions' importance, testifying: "It was just a matter of when I wanted to go talk to [the therapist]. He was somewhat of a mentor to me." (R.A. 16-17 at 12–13.) Mr. Perez also characterized the nature of his counseling sessions as not "necessarily all based on PTSD"; "I went through a divorce . . . and it's a positive outlet that I learned to use." (R.A. 16-17 at 14.)

When defense counsel asked Mr. Perez whether he had been diagnosed with any other mental health conditions, the trial court sustained an objection and called the parties to side bar. The trial court instructed defense counsel to "confine this to . . . any mental conditions you feel you should be entitled to cross examine him on that would affect his percipient abilities." (R.A. 16-17 at 15.) Defense counsel, having failed to obtain the psychological progress notes for the counseling sessions and records of Mr. Perez's psychiatric hospitalization, had no basis to refute Mr. Perez's testimony or probe issues relevant to his percipient abilities on the night of the shooting. Defense counsel's failure to secure the psychological records also prevented him from obtaining meaningful expert help with the issue of percipient ability and identification, in, as defense co-counsel put it to the trial court, "[a]n identification case." (R.A. 16-16 at 66.) The trial court warned defense counsel that Mr. Perez's therapy for divorce was not relevant; what was relevant was "how [PTSD] would affect his percipient abilities." (R.A. 16-17 at 15.) The trial court continued: "If you tie [questions about Mr. Perez's PTSD symptoms]

_____

[6] The exhibit defense counsel used to refresh Mr. Perez's memory as to his counseling appointments actually shows approximately 110 counseling appointments because the list includes non-psychological medical appointments such as "physical therapy" and "audiology." (S.A.II 10–15.)

into his mental capacity . . . you can have it. I haven't heard any objections. I just may sua sponte begin to assert myself." (R.A. 16-17 at 15.)

Defense counsel asked Mr. Perez whether he had taken prescription medication for PTSD between 2000 and 2006, and Mr. Perez testified he had not. (R.A. 16-17 at 17.) After 2007, Mr. Perez testified, he was diagnosed with borderline personality disorder and "bipolar disorder, mild manic," and he began taking medications for those conditions. (R.A. 16-17 at 17–18.) Mr. Perez also testified "there were times" between 2000 and 2007 when he "used marijuana whenever [he] would have a night terror and [he] was unable to sleep." (R.A. 16-17 at 19–20.)

Defense counsel then questioned Mr. Perez about Mr. Ramkissoon's shooting. Mr. Perez's testimony about arriving at the party largely repeated his direct testimony up to the point when Mr. Perez and Mr. Ramkissoon stood on the second-floor balcony and saw Petitioner standing on the street below. Defense counsel asked Mr. Perez what clothing Petitioner was wearing. Mr. Perez testified: "I don't exactly recall what he was wearing. I recall just his mannerisms as he was walking around. I believe it was a white T-shirt and a matching shorts to that." (R.A. 16-17 at 34.) Defense counsel asked whether Mr. Perez identified Petitioner based on his clothing, which Mr. Perez denied:

> Q:    And did you make the connection . . . that when you were out on the balcony you saw Mr. Ayala and you based that upon what? Wasn't it what he was allegedly wearing?
>
> A:    No. It was based on his face.
>
> Q:    So if I understand your testimony, from the balcony you looked down and you saw a person which you recognized his face as being Mr. Ayala, is that correct?
>
> A:    Correct.

(R.A. 16-17 at 34–35.) Defense counsel asked whether Mr. Perez noticed what Petitioner was wearing as Petitioner passed him twice in the stairwell, and Mr. Perez testified, "I didn't exactly notice what he was wearing, no." (R.A. 16-17 at 36.)

Mr. Perez testified that he, Mr. Ramkissoon, and Ms. Simms left the party, consistent with his testimony on direct. (R.A. 16-17 at 39–40.) Mr. Perez's testimony of witnessing the shooting, however, diverged in one key regard from his direct testimony: On cross-examination, Mr. Perez added that he saw muzzle flash from the shooter's weapon, and this muzzle flash sufficiently illuminated the shooter's face for him to identify the shooter by his facial features. (R.A. 16-17 at 47–48.) Mr. Perez testified he did not know whether the street lamp under which the shooter stood was illuminated at the time of Mr. Ramkissoon's shooting. (R.A. 16-17 at 95.)

Defense counsel questioned Mr. Perez about an inconsistency as to his recollection of the shooter's height and clothing. (R.A. 16-17 at 56–59.) Defense counsel also questioned Mr. Perez about his description, in his police statement, of the shooter as wearing a diamond stud earring, being between 20 and 30 years old, having a "faded short hair cut," and having a goatee. (R.A. 16-17 at 68–69.) (Although defense counsel argued in closing that Petitioner's lineup photo did not show a goatee, he did not confront Mr. Perez with any inconsistencies between the lineup photo and Mr. Perez's police report description of the shooter.)

The remainder of the Commonwealth's case included testimony from a shoeprint expert working for the Massachusetts State Police; the first-floor bouncer at the 334 Wilbraham Road party; Sergeant Mark Rolland, who arrived at the scene of the shooting at approximately 4:30 a.m.; and a ballistics expert. The shoeprint expert testified, to a reasonable degree of scientific certainty, Petitioner's sneaker recovered by the Springfield police department made the footprint impression left when someone kicked the front door of 334 Wilbraham Road. (R.A. 16-17 at 129–30.) The first-floor bouncer testified Petitioner did not want to pay the cover charge or be searched. "He just said he wanted to look around, that was it." (R.A. 16-17 at 140–41.) The first-floor bouncer testified that Petitioner was denied entry by the second-floor bouncer and "escorted . . . outside." (R.A. 16-17 at 141–42.) Once outside, Petitioner "said he was going to shut the party down," but the bouncer could

not recall his exact words. (R.A. 16-17 at 143, 144–45.) The first-floor bouncer testified she saw Petitioner kick in the front door. (R.A. 16-17 at 145.)

There was no evidence as to the lighting conditions at the time of the shooting, a little before 3:00 a.m.[7] Sergeant Rolland testified there was "[a] flood lamp fixture" "right below the second floor porch" of 338 Wilbraham Road, but he did not testify as to whether it was illuminated when he arrived at the scene at approximately 4:30 a.m. (R.A. 16-17 at 163–64.) Sergeant Rolland testified that several other street lights in the area were lit when he arrived. (R.A. 16-17 at 161–63.)

The ballistics expert testified two .22 caliber spent projectiles were recovered from Mr. Ramkissoon's body and five .22 caliber discharged cartridge casings were found in the vicinity of 338 Wilbraham Road on the morning of June 10, 2007. (R.A. 16-18 at 54–55, 57–58; S.A.I 383.) The expert further testified the spent projectiles and cartridge casings were discharged from the same semiautomatic pistol. (R.A. 16-18 at 55, 57–58; S.A.I 413–14.) The semiautomatic pistol used to shoot Mr. Ramkissoon was never recovered. On cross-examination, the ballistics expert testified the cartridge casings belonged to ".22 long rifle" ammunition, rather than ".22 short" ammunition. (R.A. 16-18 at 68.) Defense counsel then asked about muzzle flash:

> Q: [T]he muzzle flash from a .22 long rifle chambered in a semiautomatic weapon with a barrel length of less than six inches . . . . can you give the ladies and gentlemen of the jury an estimation of what the muzzle flash of that particular gun would be in the daytime first; would you be able to see it[?]
>
> A: Would you be able to see it—probably, with difficulty in the daylight . . . [i]n a sunny area.
>
> . . . .
>
> Q: At night?

---

[7] In closing argument, defense counsel argued to the jury the street lamp was on, likely to imply the street lamp illumination prevented muzzle flash from creating enough light sufficient to see a face, but thereby suggesting or conceding a well-lit scene. This was a difficult trial tactic but without Mr. Perez's psychological records to undermine his testimony, defense counsel had little to support his cross-examination of the key Commonwealth witness.

A: At night, you would be able to see it. It's dark.

Q: Whether you would be able to see it would be affected by the lighting conditions that were available next to where the weapon was being fired, wouldn't that be fair to say?

A: Perhaps, for example, if it was a well-lighted area, yes, that might impact it.

(R.A. 16-18 at 69–70.) Defense counsel did not inquire of the ballistics expert whether the muzzle flash from firing a .22 semiautomatic pistol would be sufficient to illuminate the face of the shooter for identification or the duration of muzzle flash from such a weapon.

Defense counsel called one witness, Natasha Frazier, who, at the time of the shooting, was a paid confidential informant for the FBI/Western Mass Gang Task Force and working as a D.J. at the 334 Wilbraham Road party. (R.A. 16-18 at 129–30.) After in camera examination of Ms. Frazier, the trial court ordered she testify from behind a screen allowing the court, jury, and counsel to see her, but not the public courtroom, based on her expressed concerns for her safety as a confidential informant.[8] (R.A. 16-18 at 104.) Ms. Frazier testified to knowing Petitioner because her cousin and Petitioner's late brother were "best friends."[9] (R.A. 16-18 at 132.) Ms. Frazier also testified that a week before Mr. Ramkissoon's shooting, close to 334 Wilbraham Road, "a little girl . . . got shot over there, shot down on the porch. Her name was Din[ah]. She was [Petitioner's] niece." (R.A. 16-18 at 132.) Ms. Frazier testified she noticed Petitioner outside 334 Wilbraham Road about 2:20 a.m. (R.A. 16-18 at 133.) Ms. Frazier testified:

> I put on a CD and I went downstairs to go see why he was crying. He told me he was crying because it wasn't fair that these people were throwing a party right next door to where his niece got killed at. She hadn't laid herself down in the ground yet and this is crazy.

---

[8] Defense counsel advised Petitioner to waive his right to confront Ms. Frazier, which he did, and Ms. Frazier testified out of Petitioner's line of vision. (R.A. 16-18 at 79–80.)

[9] Ms. Frazier also testified, "[A] couple years ago [Petitioner's] brother shot my cousin which in return back [*sic*] to my cousin getting accused of shooting his brother and doing a murder trial." (R.A. 16-19 at 51.)

(R.A. 16-18 at 133.) After Petitioner was denied entry to the party and kicked in the door to the house, Ms. Frazier testified, she along with other friends gave Petitioner a "group hug" and Ms. Frazier "walked him to his car and stood on the corner until he drove all the way down because [she] wanted to make sure he was alright because he was pretty upset." (R.A. 16-18 at 135.) She further explained that she "watched him go down the street because [she] didn't want him to come back around and end up beating the guy up that didn't want to let him in the party[.]" (R.A. 16-18 at 134.) When asked whether Petitioner's demeanor was one of anger, Ms. Frazier testified Petitioner expressed "[m]ostly pain." (R.A. 16-18 at 135.) Ms. Frazier testified Petitioner was driving a tan Jeep Cherokee and she estimated he left the vicinity of 334 Wilbraham about thirty to forty-five minutes before the shooting occurred. (R.A. 16-18 at 143, 154.) Ms. Frazier also testified to witnessing the shooting from the second-floor porch:

> I seen the lights from the porch and I went in instantly, turned the music off, said: Somebody just got shot. So [I] quickly ran downstairs and when I ran downstairs and ran to the corner, I seen a guy laid down on the side like on the sidewalk and like a red/maroon Taurus taking off, skidding off.

(R.A. 16-18 at 139.) Whether the source of the "lights" Ms. Frazier testified to seeing was car headlights, street lamps, muzzle flashes, or something else was not developed. Defense counsel attempted to call a law enforcement witness to bolster Ms. Frazier's credibility by confirming her status as a paid confidential informant, which the trial court denied. (R.A. 16-19 at 31; R.A.16-20 at 24–28, 45–47.)

During closing arguments, defense counsel attempted to portray Mr. Perez as an honest but unreliable witness who had mistakenly identified Petitioner. (R.A. 16-20 at 54–59.) Had defense counsel obtained the omitted psychological and psychiatric records from the Veteran's Hospital, he could have sought to develop specific evidence of this theory. Without the psychological records, defense counsel was forced to rely on incomplete medical records as well as inconsistencies between

25

Mr. Perez's description of the shooter's height and clothing in his police report, grand jury testimony, and trial testimony. (R.A. 16-20 at 54–56.)

Defense counsel then argued to the jury that Mr. Perez, contrary to his testimony, would not have been able to see any muzzle flash from the .22 firearm. (R.A. 16-20 at 56–57.) Defense counsel stated:

> Well, in your collective experience, I suggest to you that somebody on the street has some experience with [the] muzzle flash there would be with a .22 rifle and semiautomatic [weapon]. I further suggest to you[,] if you apply the common experience, the darker it is, the more you see [the muzzle flash]. But as the ballistics expert explained, it's a small amount of flash [compared] to a larger caliber gun, and it wouldn't be affected by how much light there is.
>
> So if you analyze [Mr. Perez's] testimony, I believe he testified that . . . he came from the right side of the house in that particular area and they were near the street. When he saw the flash, he turned and he saw a person that was the assailant. I suggest to you that in that period of time, from his testimony, [he] had to [have had only] a [matter] of seconds [to] ma[k]e that identification.

(R.A. 16-20 at 56–57.)

Defense counsel continued: "We have to analyze that [identification] [in light] of the fact that Mr. Perez suffers from . . . PTSD. [H]e was in the military. . . . And also[,] . . . he was bipolar." (R.A. 16-20 at 58.) Counsel then appealed to the jury's presumed expert knowledge of bipolar disorder and PTSD and how those conditions may impact percipient and recall ability: "In your collective experience, I believe you can arrive at the conclusion those are difficult illnesses and they may impact his ability to see and conceptualize what was actually happening." (R.A. 16-20 at 58–59.) Defense counsel reminded the jury Mr. Perez had therapy appointments on a near-weekly basis between 2000 and 2008, but without the accompanying psychological progress notes for the appointments, he had no way to refute Mr. Perez's characterization of the appointments as merely providing mentorship, divorce support, and a "positive outlet" in addition to sometimes addressing his PTSD symptoms. (R.A. 16-20 at 58–59; *see also* R.A. 16-17 at 14.) Defense counsel concluded:

> So I say to you, ladies and gentlemen, in this particular case it boils down to very basically a misidentification. That misidentification occurred primarily because the only person that Mr. Perez ever saw after being in a very excitable circumstance demonstrated by the fact that he allegedly jumped over a six-foot fence, heard five or six shots, suffered from PTSD and bipolar[,] was that he identified a photograph of Phil[]ip Ayala and then told the police that Phil[]ip Ayala was the person who was the shooter that evening.

(R.A. 16-20 at 63–64.)

In the Commonwealth's closing argument, the ADA acknowledged Mr. Perez's post-traumatic stress disorder but asked the jury to separate his diagnosis from his apparent percipient abilities:

> [W]hen you talk about [Mr. Perez's] military service and you talk about his post[-]traumatic stress and that he availed himself to counseling because he thought that was the healthiest thing to do, bear in mind the detail this man was able to recount to you.
>
> . . .
>
> Robert Perez has issues. He told you as a result of military duty, he suffers from post[-]traumatic stress. I ask you, however, to focus in on his opportunity to see the person, the shooter. His opportunity, the distance or closeness that he was to the shooter. You saw him testify. You had an opportunity to review how he testified, his memory, the attention to detail.

(R.A. 16-20 at 66, 71.) Uncontradicted and uninformed by the psychological records showing Mr. Perez's severe PTSD symptoms and the connection between his symptoms and military experience, the ADA actually argued that Mr. Perez's military experience strengthened his percipient abilities:

> He's paying attention. He's alert. He's using perhaps his military background. He turns and he sees the person that he recognizes as the same guy who caused the problem. That's why he wanted to leave the party. He said he went up to get Clive because he thought that he should go. He focuses on Mr. Ayala up the stairs, down the stairs from the front porch that you saw. He was looking at him in his agitated state. Twenty minutes later he recognizes him firing a gun that ultimately killed his friend.
>
> You have to listen and be cognizant of the detail that this man was able to provide. His senses, his memory, he recognizes the person as the same guy. That's why they were leaving the party is because of this man's actions.

(R.A. 16-20 at 68–69.)

The jury convicted Mr. Ayala of first-degree murder, unlawful possession of a firearm, and unlawful possession of ammunition without an identification card. (R.A. 16-20 at 115–16.) Mr. Ayala was sentenced to life without parole. (R.A. 16-21 at 9.)

C.  PROCEDURAL POSTURE

Petitioner entered an appeal in the SJC and filed a motion for a new trial based on ineffective assistance of counsel on the following grounds: failure to investigate potentially exculpatory eyewitness testimony that other individuals were seen running from the scene of the shooting; failure to sufficiently explore flaws in the Commonwealth's firearms expert's conclusions; and a failure to investigate potentially significant flaws in Mr. Perez's testimony identifying Mr. Ayala as the shooter. (S.A.I 100.) The trial court judge granted Petitioner a hearing on the motion in September 2012, but retired before the hearing was held. (S.A.II 452–53.)

In February 2014—almost five years after Petitioner's criminal trial—post-conviction counsel re-served the trial court's second subpoena for Mr. Perez's psychological, psychiatric, and social worker records on the Veterans Hospital and obtained hundreds of pages in response. (S.A.II 54–310.).

1.  The omitted psychological and psychiatric records for Robert Perez

Mr. Perez's psychological records totaled hundreds of pages of psychological counseling notes, psychiatric hospitalization records, and psychiatric medication lists. (S.A.II 54–310.) Mr. Perez's psychological counseling notes and psychiatric hospitalization records, in particular, portrayed Mr. Perez as suffering from serious PTSD symptoms, including paranoia and intrusive thoughts, before, after, and immediately following Mr. Ramkissoon's shooting. The psychological counseling notes also explained Mr. Perez's underlying trauma—a homicide in or about 2000 in Germany wherein Mr. Perez accidentally shot and killed a man during a military operation.

Mr. Perez's psychological records show factual similarities between the German shooting and Mr. Ramkissoon's shooting: both involved close-range shootings, use of a Ruger pistol, sounds of pistol gunfire, teeth being knocked out (Mr. Perez's in Germany and the decedent's in this case), bloody mouths, a fatality, Mr. Perez getting the victim's blood on his person, and Mr. Perez's immediate flight on foot following the shootings. (*See, e.g.,* S.A.II 96–97, 148.) The missing psychological records also show how the German shooting and Mr. Ramkissoon's shooting triggered PTSD symptoms in Mr. Perez, including flashbacks, paranoia, insomnia, anger, anxiety, and hypervigilance.[10] The missing records also indicate Mr. Perez suffered serious symptoms from PTSD for years prior to Mr. Ramkissoon's shooting continuing through the date of his trial testimony, directly contradicting Mr. Perez's testimony to the jury and to the doctor conducting his competency evaluation. (*Compare* R.A. 16-16 at 47 (Dr. Burke: "[Mr. Perez] told me at that time [of Mr. Ramkissoon's shooting] he was not on any medications at the time and he was feeling, prior to the incident, okay. . . . [H]e wasn't suffering from symptoms of a mental illness at that time."); *with* S.A.II 170 (Nov. 2, 2007 inpatient psychiatric hospitalization admission). None of these details were available to the jury or the trial court when it denied Petitioner's motion for psychological expert testimony.

The day after Mr. Ramkissoon's shooting, Mr. Perez made an unscheduled, "emergency" visit to his therapist, who wrote the following notes:

---

[10] (*See, e.g.,* S.A.II 202 ("[A]fter that I was unable to sleep and I always carried my weapon. I still cannot go in public bathrooms . . . . I can't get over this. There was blood and tissue on me."); S.A.II 197 ("I have trouble sleeping and my mouth aches when I wake up—I know it's connected to the incident in Germany."); S.A.II 179 (reporting an injury to his mouth triggering PTSD flashback: "when [my mouth] started bleeding I went backwards—to the incident I told you about"); S.A.II 148 ("I never adjusted after the military."); S.A.II 97 ("He began to develop symptoms of PTSD immediately following the [German shooting] incident. He had nightmares, difficulty being around people, hypervigilance. He . . . would get up at night with his weapon and 'clear the house.' He even got a German Shepherd to guard the house. He reports frequent intrusive thoughts and has had flashbacks. He recently got a cut on his head that bled a lot and flashed back to the incident when he had to kill someone and had his mouth injured. He started speaking German and frightened his girlfriend with his behavior.").

Walk-in – emergency – I had to talk to you – Saturday night we watched the fight and then we went to a strip club – going home we met someone – a girl – then an after-hours party – he had been drinking and I only had two beers all night – I use marijuana – he was shot three times – he was laying [*sic*] in the street – I started to get out – his teeth were shattered – like mine in Germany – I tried to call the police – my cell phone was dead – I flagged down a car – the cops took forever to come – I'm angry – I am the primary witness and I identified the shooter – my friend was 32 – they said it was gang related – it was random – I feel guilt I wanted to be able to save him – I can't go to work today – I don't want medication – am I paranoid? I want to get a gun – the girl wouldn't identify him. The police gave me their phone numbers – I really can't have a gun – I have a felony – what would you do? I haven't seen my son – [wearing a] shirt tie tearful at times – borderline – several issues – self protection, guilt – some flashbacks to an incident in Germany – he knows he cannot get a gun without severe consequences – confused – adjustment disorder – 50 minutes . . . .

(S.A.II 173.)

Between October 7 and October 12, 2007, Mr. Perez was hospitalized for breathing trouble and panic attacks related to his anxiety and PTSD. (S.A.II 169, 172.) Mr. Perez was admitted to the psychiatric ward at the Veteran's Hospital for PTSD from November 2 to November 5, 2007 because his mother worried he would "continue to self[-]destruct." (S.A.II 154, 170.) During his therapeutic counseling sessions and inpatient hospitalization, Mr. Perez directly connected his memory of witnessing Mr. Ramkissoon's shooting with his memory of shooting a man in Germany. (*See, e.g.,* S.A.II 169 ("Vet says that a couple of months ago he witnessed his friend being shot . . . . Had witnessed a similar incident while in the Army in Germany back in 2000. Now is having PTSD symptoms: nightmares, night sweats, paranoia, flashbacks, ang[er] and hypervigilance."); S.A.II 154 ("Around June he witnessed a friend killed in Springfield and this triggered intrusive thoughts about [the shooting in Germany]"); S.A.II 148 ("[Mr. Ramkissoon's] bloody mouth reminded me of my mouth injury in [the German shooting incident]"); S.A.II 118 ("Veteran also notes ongoing physical concerns, anxiety, and PTSD symptoms that were related to military experience that were re-triggered when he was present for the shooting death of a close friend."); S.A.II 119 ("About two years ago a friend of his was shot while they were walking in Springfield. Veteran attempted to provide mouth to mouth that re-triggered reported combat related PTSD symptoms."); S.A.II 102 ("P[atient] also

complaining of intrusive memories and nightmares worse since 2007."); S.A.II 163 ("He stated that around this time of the year, he begins to lose control of his PTSD [due to] the fact of event that happened to him in Germany where he lost his upper teeth."); S.A.II 147 ("Vet reports witnessing his friend being shot and killed recently and that a similar incident happen[ed] to him in 2000 while in the Army in Germany. He now admits to symptoms of PTSD, nightmares, night sweats, paranoia and flashbacks.").)

Based on Mr. Perez's psychological and psychiatric records, Petitioner sought to amend his motion for a new trial in 2014 to include an ineffective assistance of counsel claim for failure to obtain these records at the time of trial. As additional support, post-conviction counsel submitted an independent medical evaluation and expert opinion from psychiatrist Dr. Jose Hidalgo. (S.A.II 311–319.) Dr. Hidalgo based his opinion on Mr. Perez's trial and grand jury testimony, the Veteran's Hospital psychological records produced to the clerk's office in 2014,[11] Mr. Perez's letters to the ADA, and other documentation. (S.A.II 313–14.) Dr. Hidalgo gave the following opinions to a reasonable degree of scientific certainty:

> It is also my opinion that Mr. Perez was suffering from post[-]traumatic stress symptoms prior to, during, and after the incident of June 10, 2007. Post[-]traumatic stress disorder refers to an emotional condition that can occur as a result of exposure to life threatening or extremely traumatic events. A key aspect of post[-]traumatic stress disorder is that following a traumatic event a person may become emotionally very reactive to reminders of the original trauma. For example, reminder cues such as smells, sounds, and images of the original traumatic event can elicit strong emotional reactions and a person may feel as if he is back in the original traumatic event, even though the event itself may have occurred in the distant past. This is often referred to as a flashback. Other aspects of post[-]traumatic stress disorder include intrusive memories, attempts to avoid thoughts and feelings of the traumatic event, high anxiety and fear, sleep problems, and nightmares.
>
> . . . .

---

[11] Although Dr. Hidalgo reviewed Mr. Perez's psychological records for the period 2000-2012, he stated: "The opinions I expressed in this report would have been the same had Mr. Perez's mental health records ended in July 2009 [before Mr. Ayala's August 2009 trial]." (S.A.II 319.)

[I]t is also my opinion that these mental and emotional conditions had the potential to and may have interfered with Mr. Perez's abilities to accurately perceive or recollect the events of June 10, 2007. My opinion is based on the following: . . . .

- Both borderline personality disorder and post[-]traumatic stress involve difficulty regulating emotions and dealing with stress. The incident of June 10, 2007 appears to have overwhelmed Mr. Perez's already fragile emotional coping capacities. Mr. Perez appears to have made the link between his friend's murder and his own mouth injuries[12] sustained at the time he was in the military service. Re-experiencing a traumatic event in the form of flashbacks and/or memories increases the level of emotional reactivity and can affect perception of reality and recall.

- On June 11, 2007, during a visit to his long time therapist, Mr. Perez continued to be fearful and stressed and Dr. Lenchitz documents that Mr. Perez was having flashbacks.

(S.A.II 318–19.)

### 2. Motions for new trial and direct appeal

On June 30, 2015, Judge C. Jeffrey Kinder, who was reassigned to the case, denied Petitioner's amended motion for a new trial as to the ineffective assistance claim for failure to obtain the psychological records and denied Petitioner's request for an evidentiary hearing on that claim. (S.A.I 102–03.) The trial court's explanation for denying both an evidentiary hearing and Petitioner's amended motion is reproduced below, in full:

As to defendant's claim that trial counsel was ineffective for failing to notice the absence of some of the eyewitness's psychological records, I conclude that he has failed to raise a substantial issue warranting further hearing. I find, essentially for the reasons set forth in the Commonwealth's opposition, that trial counsel was aware of the diagnoses contained in those records, including the eyewitness's marijuana use, hired an expert to assist in the analysis of those records and cross-examined the eyewitness on those issues at trial. Under these circumstances, I am not persuaded that trial counsel rendered ineffective assistance by failing to obtain and introduce additional expert testimony on the eyewitness's mental condition, particularly in light of the trial judge's rulings that such expert testimony would be limited to opinions about the eyewitness's percipient abilities at the time of the shooting. In my judgment, even if trial counsel had the complete set of records and had additional expert

---

[12] Mr. Perez described seeing Mr. Ramkissoon bleeding from the mouth after he was shot and hit his head on the concrete. Mr. Perez had his own teeth knocked out during the shooting incident that caused him to experience PTSD symptoms.

assistance in analyzing those records, they would not have added to the information already at his disposal and used in cross-examination at trial. Accordingly, as to this issue, no further hearing is necessary and the motion for a new trial is denied.

(S.A.I 102–03) (internal alteration omitted).)

The trial court held a three-day evidentiary hearing on the three grounds raised in Petitioner's first motion for a new trial. (S.A.I 583–594.) On November 18, 2015, the court issued a memorandum and order denying Mr. Ayala's first motion for a new trial. (*See* S.A.I 583–594 (*Commonwealth v. Ayala*, No. 07-863 (Nov. 18, 2015)).)

The SJC consolidated the direct appeal of Petitioner's convictions and the collateral appeal of the denials of his motions for a new trial, upholding the convictions and affirming the latter. *See Ayala*, 112 N.E.3d at 257. This court now recounts only those findings relevant to the Petitioner's claims for (1) ineffective assistance based on trial counsel's failure to obtain Mr. Perez's psychological records; and (2) insufficiency of the evidence.

Because Petitioner was convicted of first-degree murder, the SJC analyzed Mr. Ayala's ineffective assistance of counsel claims under "the more favorable standard of [Mass.] G. L. c. 278, § 33E . . . to determine whether there was a substantial likelihood of a miscarriage of justice." *Ayala*, 112 N.E.3d at 252–53. "Under this review, we first ask whether defense counsel committed an error in the course of the trial. If there was an error, we ask whether it was likely to have influenced the jury's conclusion." *Id.* at 253 (internal citations omitted). The relevant portion of the SJC's analysis is produced below, in full:

> Finally, the defendant argues that his trial counsel was ineffective for failing to notice that certain psychological records detailing Perez's history of mental health struggles and drug use mistakenly had been withheld despite a court order compelling their disclosure. Without these records, the defendant argues, trial counsel was unable to explore the full extent of how Perez's mental health and drug use could have affected his "ability to accurately perceive and identify the shooter." The motion judge denied the defendant's motion for a new trial without conducting an evidentiary hearing on this argument. He concluded that because these issues were sufficiently before the jury, the additional records would not have "added to the information already at [trial counsel's] disposal and used in cross-examination at trial." We agree.

As discussed *supra*, Perez's PTSD and bipolar disorder diagnoses were both brought out on cross-examination at trial. Specifically, Perez testified that he had been diagnosed with PTSD and bipolar disorder, that he received counselling and medication to treat the diagnoses, and that he had a counselling session on the day after the murder. He further testified that over the period of approximately eight years following his discharge from the military, he had sought counselling for his PTSD 161 times and that he suffered from "night terror[s]" and sleeplessness as a result of his PTSD. Additionally, he testified that he used marijuana to cope with the effects of his PTSD diagnosis.

Notably, there was no evidence—either introduced at trial or contained within the missing records—that suggests that Perez's mental health struggles or drug use affected his ability to perceive the defendant on the morning of the shooting. For example, a defense expert's proffered testimony only acknowledged that Perez's mental health struggles "had the potential to and may have interfered with Mr. Perez's abilities to accurately perceive or recollect the [shooting]." Trial counsel argued this point specifically during closing, stating that Perez's diagnoses "are difficult illnesses and they may impact his ability to see and conceptualize what was actually happening." Additionally, although the missing records suggest that Perez was more dependent on marijuana than his testimony let on, there was no evidence that he was under the influence of marijuana on the morning of the shooting. The defendant's proffered expert on this point would not have materially added to the defense, as he was prepared only to testify that individuals have a reduced ability to accurately perceive reality and recall past events while under the influence of mind-altering substances. Because the substance of the missing records and proffered expert testimony was already presented to the jury, any error on the part of trial counsel in failing to notice the missing records was not likely to influence the jury's conclusion. *See Commonwealth v. Williams*, 453 Mass. 203, 212–213, 900 N.E.2d 871 (2009) (rejecting ineffective assistance of counsel claim based on counsel's failure to introduce records where substance of records was already before the jury). The motion judge therefore did not err in denying the defendant's motion for a new trial.

*Ayala*, 112 N.E.2d at 255–56 (internal footnote omitted). As explained in further detail below, the court holds the state court's decision on this ineffective assistance claim involved an unreasonable application of clearly established federal law and was based upon unreasonable findings of fact.

Petitioner also argued the evidence was insufficient to support his convictions "because the illuminating capability of a muzzle flash is not within the ordinary, common experience of a reasonable juror, [so] the jury could not have found the evidence proved beyond a reasonable doubt, without speculation, that the defendant was the shooter." *Id.* at 245. The SJC "draw[ing] all reasonable inferences in favor of the Commonwealth," concluded that "any rational trier of fact could have found

34

the essential elements of the crimes beyond a reasonable doubt." *Id.* at 244. "Although there was no evidence whether the specific street light near where the shooter was standing was on at the time of the shooting, a juror could reasonably have inferred that if the street lights in the area were on at 4:30 A.M. [as a Springfield detective testified], they would have also been on at the time of the shooting earlier in the morning." *Id.* at 245. Moreover, the jury heard evidence about Mr. Perez's multiple opportunities to see Petitioner's face when they passed in the stairwell and Mr. Perez's identification of Petitioner as the shooter from a photo array. The SJC further cited the Commonwealth's "circumstantial evidence linking the defendant to the shooting," including testimony that he appeared upset at the house party, refused to be searched, threatened to return to "light th[e] place up," kicked in the front door, and was seen pacing on the street in front of the house shortly before Perez and Ramkissoon left the party. *Id.* at 246 (alteration in original). "From this evidence, the jury could have reasonably inferred that the defendant did not want to be searched on the morning of June 10 because he was carrying a gun, that he was still near the house when the shooting occurred, and that his anger about the party motivated him to shoot Ramkissoon as he crossed the street." *Id.*

On April 21, 2020, Petitioner filed this Petition for a Writ of Habeas Corpus and amended it with the court's permission on September 2, 2020. The court heard oral argument on May 4, 2022.

### III. HABEAS STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "demands that a federal habeas court measure a state court's decision on the merits against a series of 'peculiarly deferential standards.'" *Porter v. Coyne-Fague*, 35 F.4th 68, 74 (1st Cir. 2022) (quoting *Cronin v. Comm'r of Prob.*, 783 F.3d 47, 50 (1st Cir. 2015)). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). AEDPA provides that habeas relief

shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved the unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Petitioner has two ways to satisfy the first path to habeas relief under § 2254(d)(1). *Porter*, 35 F.4th at 74. First, Petitioner may show the state court's decision is "contrary to" clearly established federal law if the state court applied a legal rule that contradicts the rule established by Supreme Court precedent or if it "reache[d] a different result on facts materially indistinguishable from those of a controlling Supreme Court precedent." *Malone v. Clark*, 536 F.3d 54, 62 (1st Cir. 2008) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). Second, Petitioner may show the state court's decision involves an "unreasonable application" of federal law "if the court . . . 'identifies the correct governing legal rule . . . but unreasonably applies it to the facts of a particular state prisoner's case.'" *Dagley v. Russo*, 540 F.3d 8, 13 (1st Cir. 2008) (quoting *Williams*, 529 U.S. at 407). "Federal habeas relief only 'provides a remedy for instances in which a state court unreasonably applies [the Supreme] Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.'" *Bebo v. Medeiros*, 906 F.3d 129, 134 (1st Cir. 2018) (quoting *White v. Woodall*, 572 U.S. 415, 426 (2014) (alteration in original and emphasis omitted)). "Importantly, an *unreasonable* application of federal law is different from an *incorrect* application of federal law. If fair[-]minded jurists could disagree on the correctness of the state court's decision, there was no unreasonable application of federal law." *Hollis v. Magnusson*, 32 F.4th 1, 8 (1st Cir. 2022) (quoting *Scott v. Gelb*, 810 F.3d 94, 101 (1st Cir. 2016) (internal quotation marks and citations omitted)).

The second path to habeas relief, § 2254(d)(2), requires Petitioner to show the state court's decision on the merits "was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Section 2254(e)(1) states "a determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted "by clear and convincing evidence." *Id.* § 2254(e)(1). These two provisions of AEDPA, both of which "seem to address essentially the same scenario," have caused confusion. *See Porter*, 35 F.4th at 79 (noting Supreme Court and First Circuit have left open the question of how to resolve the "tension" between § 2254(d)(2) and (e)(1)). "[T]his circuit has routinely held petitioners to the § 2254(e)(1) clear and convincing standard—although we have never done so in a case in which resolving the fit between the two sections would appear to have made any difference." *Id.* (quoting *Smith v. Dickhaut*, 836 F.3d 97, 101 (1st Cir. 2016) (internal quotation marks omitted)). In the present case, "all roads lead to Rome: the outcome of our inquiry would be the same whether a habeas petitioner only has to show that the state court decision 'was based on an unreasonable determination of the facts,' 28 U.S.C. § 2254(d)(2), or whether he also has to satisfy subsection (e)(1)'s 'clear and convincing' standard." *Id.* (assuming, without deciding, "more stringent" clear and convincing evidence standard under (e)(1) applied and remanding with order to grant habeas relief). This court, therefore, follows Supreme Court and First Circuit precedent in declining to resolve the "tension" between § 2254(d)(2) and (e)(1) and— as it makes no difference to the outcome of this case—holds Petitioner to the more exacting standard under (e)(1). *Id.* Once a petitioner satisfies either path to habeas relief, the federal court discards the deferential lens of AEDPA and reviews his claim de novo. *Id.* at 82.

## IV.    INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD

An ineffective assistance of counsel claim is analyzed under *Strickland v. Washington*, 466 U.S. 668. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. First, Petitioner must show his counsel's performance was constitutionally deficient, meaning that, "in light of all the circumstances, the identified acts or

omissions were outside the wide range of professionally competent assistance" under the Sixth Amendment. *Id.* at 690. Second, Petitioner must show counsel's deficient performance caused him "prejudice," meaning "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result was reliable." *Id.* at 687. A showing of prejudice requires a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "To succeed on the prejudice prong, it is not enough for [Petitioner] 'to show that the errors had some conceivable effect on the outcome,' but he is also not required to 'prove that the errors were more likely than not to have affected the verdict.'" *Rivera v. Thompson*, 879 F.3d 7, 12 (1st Cir. 2018) (quoting *Gonzalez-Soberal v. United States*, 244 F.3d 273, 278 (1st Cir. 2001) (quoting *Strickland*, 466 U.S. at 693) (internal quotation marks omitted)). "Instead '[a] reasonable probability is one sufficient to undermine confidence in the outcome.' In essence, the prejudice inquiry is focused on 'the fundamental fairness of the proceeding.'" *Id.* (internal quotation marks and citations omitted).

"When combined with *Strickland*'s already highly deferential standard for a trial attorney's conduct, the AEDPA standard is doubly so, requiring the court to ask whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 12 (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotation marks and citation omitted)). However, where, as here, the state court addressed only one of *Strickland*'s prongs on the merits, this court reviews the other prong de novo. *See id.* at 12–13 (citing *Rompilla v. Beard*, 545 U.S. 374, 390 (2005)). The state court did not reach the merits of the performance prong, and this court reviews de novo whether defense counsel's performance was constitutionally deficient.

The state court used the following standard for Petitioner's ineffective assistance claims: "[W]e first ask whether defense counsel committed an error in the course of the trial. If there was an error, we ask whether it was likely to have influenced the jury's conclusion." *Ayala,* 112 N.E.3d at 253 (internal citations omitted). The First Circuit has recognized this state law standard "is at least as

generous to the defendant as the federal ineffective assistance of counsel standard." *See Horton v. Allen*, 370 F.3d 75, 86 (1st Cir. 2004). This court, therefore, "will presume the federal law adjudication to be subsumed within the state law adjudication" and considers the state court's prejudice analysis as having been decided on the merits. *Sleeper v. Spencer*, 510 F.3d 32, 39 (1st Cir. 2007) (internal quotation marks omitted). Because the state court reached the merits of the prejudice prong, the state court's decision on that prong is entitled to AEDPA deference unless Petitioner shows the decision involved an unreasonable application of law under § 2254(d)(1) or was based upon an unreasonable determination of fact(s) under § 2254(d)(2) and (e)(1).[13]

A. DEFICIENT PERFORMANCE UNDER *STRICKLAND*: COUNSEL'S FAILURE TO OBTAIN PSYCHOLOGICAL RECORDS

Because the SJC did not decide the first prong of *Strickland*—whether trial counsel's performance was deficient—on the merits, this court reviews it de novo. *See Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir. 2001) (holding preserved federal constitutional claims "never addressed by the state courts" are reviewed de novo on habeas). The court holds defense counsel's performance fell well below the standard of a reasonably competent attorney. *See Brown v. Smith*, 551 F.3d 424, 431 (6th Cir. 2008) (finding deficient performance on de novo review where trial counsel failed to obtain psychological counseling records for witness where state's "entire case hinged on [her] credibility"). "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 688). Petitioner has amply met his burden.

---

[13] Respondent does not develop any argument that § 2254(d)(1) provides the exclusive means of analyzing ineffective assistance claims, and the First Circuit has used both § 2254(d)(1) and (d)(2) when considering ineffective assistance claims. *See, e.g., Smith*, 836 F.3d at 106 (denying habeas relief where petitioner did not show SJC's decision on ineffective assistance was an unreasonable application of law under (d)(1) or based upon unreasonable factual findings under (d)(2)).

At the start of the case, defense counsel knew Mr. Perez was the sole witness identifying Petitioner as the shooter; that Mr. Perez had been diagnosed with PTSD; and that undermining Mr. Perez's percipient abilities and credibility was of utmost importance to defense counsel's chosen strategy. Upon receiving discovery from the Commonwealth sometime after January 25, 2008, defense counsel also knew Mr. Perez had been treated by a psychologist at the Veteran's Hospital in regular, near-weekly sessions between 2000 and 2008. Yet, defense counsel did not seek an order subpoenaing Mr. Perez's psychological and psychiatric records from the Veteran's Hospital until the first day of trial. And when the court allowed the motion, defense counsel did not review the subpoena that the Commonwealth drafted, which explicitly excluded the very mental health documents defense counsel sought. Most egregiously, when the Veteran's Hospital produced a 38-page file for Mr. Perez, which was conspicuously missing Mr. Perez's psychological counseling notes, psychological evaluations, and psychiatric in-patient hospitalization records, defense counsel realized the omission—telling the trial court, "those records cannot in any way, any possible fashion, shape or form be complete"—but did nothing to correct it because it "slid off [his] radar."[14] (S.A.I 463–64; R.A. 16-16 at 59.)

In a July 21, 2014 affidavit, defense counsel admitted:

I failed to notice that the records sent to the Clerk's Office contained only the medical records. The mental health records were not sent. When I recognized, mid-trial, that the mental health records were missing, I did not follow up. Even when I sent out the medical records for review mid-trial, I did not follow up and obtain the missing mental health records. Not doing so was not a strategic decision. I was busy and distracted by other matters. The missing mental health records slid off my radar.

---

[14] Defense counsel even recognized, ex ante, that failing to review Mr. Perez's mental health records prior to Mr. Perez's testimony would amount to ineffective assistance of counsel. (R.A. 16-13 at 5–6 (Defense counsel: "[T]o avoid an IAC [ineffective assistance of counsel violation], I believe that I should file a motion to get the medical records since [Mr. Perez] has a documented history, and I assume he's back at Leeds for his PTSD relative to his being the only eyewitness that places my client at the scene of the shooting."); R.A. 16-13 at 137 (Defense counsel: "I believe it would be IAC [to conduct] cross-examination without examining why [Perez is] at Leeds, for example, since it's the Commonwealth's only percipient witness").)

(S.A.I 463–64). "The record . . . underscores the unreasonableness of counsel's conduct by suggesting that [his] failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 526 (2003).

The *Strickland* Court held, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. The Court continued: "[S]trategic choices made after thorough investigation . . . are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. Here, no "reasonable professional judgments" supported defense counsel's failure to obtain the psychological records of the Commonwealth's key witness in an identification case. *See Wiggins*, 539 U.S. at 527 ("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."). "The consequences of inattention rather than reasoned strategic decisions are not entitled to the presumption of reasonableness." *Dunn v. Jess*, 981 F.3d 582, 591 (7th Cir. 2020) (citation and quotation marks omitted) (finding deficient performance due to trial counsel's "inattention"); *see also Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003) ("Counsel's failure to investigate [by not interviewing eyewitness] was not part of a calculated trial strategy but is likely the result of either indolence or incompetence." (internal quotation marks and footnote omitted)).

Under these circumstances, the court holds defense counsel's performance in this case fell below an objective standard of reasonableness. *See York v. Ducart*, 736 F. App'x 628, 630 (9th Cir. 2018) (finding deficient performance under AEDPA where "[n]o conceivable strategic judgment could explain counsel's failure to review [cell phone] records" undercutting credibility of state's key witness); *Commonwealth v. Field*, 79 N.E.3d 1037, 1041–42 (Mass. 2017) (finding deficient performance where counsel failed to consult psychological expert despite knowing defendant's mental state was

central to his strategy and obtaining funds for the purpose); *Gersten v. Senkowski*, 426 F.3d 588, 605–06 (2d Cir. 2005) (finding deficient performance where "evidence that counsel failed to discover would have been entirely consistent with his chosen defense theory").

B.   PREJUDICE PRONG UNDER *STRICKLAND*

The SJC decided the second prong of *Strickland* on the merits, and this court therefore applies AEDPA's "doubly deferential" lens. *See Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). Habeas relief may not be granted unless the state court's decision: (1) involved an unreasonable application of federal law under § 2254(d)(1); or (2) was based upon an unreasonable finding of fact shown by clear and convincing evidence under § 2254(d)(2), (e)(1). *See Brumfield v. Cain*, 576 U.S. 305, 312 (2015) (holding state court's decision was based upon two unreasonable findings of fact and, therefore, declining to decide whether decision was also an unreasonable application of federal law). This court holds that the state court's analysis of prejudice under *Strickland* involved an unreasonable application of federal law and was based upon unreasonable findings of fact.

1.   Unreasonable findings of fact

This court holds two factual findings upon which the state court premised its decision were unreasonable within the meaning of § 2254(d)(2), as shown by "clear and convincing evidence":

- "[T]here was no evidence . . . contained within the missing records . . . that suggests that Perez's mental health struggles . . . affected his ability to perceive the defendant on the morning of the shooting." *Ayala*, 112 N.E.3d at 256.

- "Because the substance of the missing records and proffered expert testimony was already presented to the jury, any error on the part of trial counsel in failing to notice the missing records was not likely to influence the jury's conclusion." *Id.*

 Section 2254(d)(2) "requires that we accord the state trial court substantial deference. If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Brumfield*, 576 U.S. at 314 (internal

quotation marks and alteration omitted) (reversing denial of writ and remanding where "our examination of the record before the state court compels us to conclude that both of its critical factual determinations were unreasonable"). For the reasons described below, the court holds that, as to the above two factual findings by the SJC regarding the contents of Mr. Perez's psychological records and the adequacy of their presentation to the jury—when none were actually presented or even known to defense counsel—no reasonable person reviewing the record could agree with these two findings of the state court. Petitioner has met his burden under § 2254(e)(1) of rebutting "the presumption of correctness of [the] state court's factual findings by clear and convincing evidence." *Burgess v. Comm'r, Ala. Dep't of Corr.*, 723 F.3d 1308, 1315 (11th Cir. 2013) (internal quotation marks and alterations omitted).

The SJC's finding that "there was no evidence . . . contained within the missing records . . . that suggests that Perez's mental health struggles . . . affected his ability to perceive the defendant on the morning of the shooting" is contradicted by a wealth of evidence in the psychological records and, in light of that evidence, is patently unreasonable. *Ayala*, 112 N.E.3d at 256; *see Brumfield*, 576 U.S. at 316 (holding state court finding regarding petitioner's intellectual functioning "an unreasonable determination of the facts"); *Wiggins*, 539 U.S. at 528 (quoting § 2254(e)(1) in determining state court's factual finding about the substance of certain records was unreasonable because a review of the records revealed the opposite of what the state court stated in its decision). Counseling notes describe how certain stimuli present on the night of Mr. Ramkissoon's shooting were either triggers for or associated with Mr. Perez's PTSD symptoms, including bloody mouths and injuries to teeth (*see, e.g.,* S.A.II 97, 119, 148, 173, 179, 197); hypervigilance and concerns about physical safety (*see, e.g.,* S.A.II 97, 173); gunfire/shootings (*see, e.g.,* S.A.II 128, 147, 154, 169); and the sight of blood (*see, e.g.,* S.A.II 83, 97, 202). The psychological records also indicate that, on numerous occasions, Mr. Perez described how witnessing Mr. Ramkissoon's shooting caused him to remember, recall, or flash back to the

German shooting. (*See, e.g.,* S.A.II 173 (counseling notes from "emergency" appointment the day after the shooting in which therapist documented "some flashbacks to [the shooting] in Germany" and Mr. Perez's own statements describing his paranoia and connecting his memories of the two shootings); S.A.II 169 (Mr. Perez described Mr. Ramkissoon's shooting as "similar" to the Germany incident and stated he is now "having PTSD symptoms"); S.A.II 153 (same); S.A.II 154 ("Around June he witnessed a friend killed in Springfield and this triggered intrusive thoughts about [the shooting in Germany].")); S.A.II 118 ("Veteran also notes ongoing physical concerns, anxiety, and PTSD symptoms that were related to military experience[s] that were re-triggered when he was present for the shooting death of a close friend."); S.A.II 119 ("Veteran attempted to provide mouth to mouth [to Mr. Ramkissoon] that re-triggered reported combat related PTSD symptoms.").)

The state court's finding that "the substance of the missing records and proffered expert testimony was already presented to the jury" and "the additional records would not have added to the information already at trial counsel's disposal and used in cross-examination" is also unreasonable within the meaning of § 2254(d)(2). *Ayala*, 112 N.E.3d at 255–56. It was objectively unreasonable for the SJC to conclude that the substance of the hundreds of pages of detailed psychological and psychiatric records—describing Mr. Perez's PTSD symptoms, triggers, and repeated parallels between his experiences and recollections of the German shooting and Mr. Ramkissoon's shooting—"would not have added" anything to defense counsel's limited inquiry into Mr. Perez's PTSD symptoms on cross-examination. *See Hughes v. Vannoy*, 7 F.4th 380, 392 (5th Cir. 2021) (finding "no fair[-]minded jurist could conclude that the failure to introduce . . . testimony [impeaching credibility of the state's key witness] would not have undermined confidence in the outcome" (internal quotation marks, alteration, and footnote omitted)). The trial court limited defense counsel's questioning to Mr. Perez's "own understanding" of his symptoms and whether he still suffered from PTSD or suffered from PTSD at the time of Mr. Ramkissoon's shooting.

The SJC wrote:

> Perez's PTSD and bipolar disorder diagnoses were both brought out on cross-examination at trial. Specifically, Perez testified that he had been diagnosed with PTSD and bipolar disorder, that he received counselling and medication to treat the diagnoses, and that he had had a counselling session on the day after the murder. He further testified that over the period of approximately eight years following his discharge from the military, he had sought counselling for his PTSD 161 times and that he suffered from 'night terror[s]' and sleeplessness as a result of his PTSD. Additionally, he testified that he used marijuana to cope with the effects of his PTSD diagnosis.

*Ayala*, 112 N.E.3d at 255–56 (internal footnote omitted). After reviewing the detailed psychological records, the SJC treated Petitioner's PTSD and bipolar disorder as generic, commonly understood, and uncomplicated mental health issues for which expert evidence was unnecessary.

Neither the psychiatrist examining Mr. Perez for competency, nor the judge denying Petitioner's motion for expert testimony, nor the jury assessing Mr. Perez's credibility, eyewitness competency, and percipient abilities, knew about the overlapping details between the two shootings, or that both shootings triggered PTSD in Mr. Perez, or that Mr. Perez continued to struggle with PTSD symptoms before and immediately after Mr. Ramkissoon's shooting as well as at the time he testified. The judge and the jury, in fact, heard the opposite from Mr. Perez, who testified his PTSD was "under control"; that for him, "[i]t's just basically . . . remembering a bad time" and he "had done the steps that [he] needed to do to get [him]self better"; and the effect it had on him at the time of Mr. Ramkissoon's shooting was "minimal." (R.A. 16-17 at 11–12.) This court holds it was objectively unreasonable for the SJC to conclude Mr. Perez's mental health issues, as they related to his "ability to accurately perceive and identify the shooter . . . [,] were sufficiently before the jury" or that "the additional records would not have added to the information already at trial counsel's disposal." *Ayala*, 112 N.E.3d at 255 (internal quotation marks and alterations omitted).

To the extent the SJC relied on trial counsel's closing argument as an adequate substitute for expert psychiatric evidence, that finding, too, was unreasonable. *See* 28 U.S.C. § 2254(d)(2).

45

Defendant's proffered expert, Dr. Hidalgo, swore he would have testified that, in his expert opinion, "Mr. Perez was suffering from post[-]traumatic stress symptoms prior to, during, and after the incident of June 10, 2007. . . . [I]t is also my opinion that these mental and emotional conditions had the potential to and may have interfered with Mr. Perez's abilities to accurately perceive or recollect the events of June 10, 2007." (S.A.II 318–19.) Dr. Hidalgo would have further testified that Mr. Perez's

> borderline personality disorder and post[-]traumatic stress involve difficulty regulating emotions and dealing with stress. The incident of June 10, 2007 appears to have overwhelmed Mr. Perez's already fragile emotional coping capacities. Mr. Perez appears to have made the link between his friend's murder and his own mouth injuries sustained at the time he was in the military service. Re-experiencing a traumatic event in the form of flashbacks and/or memories increases the level of emotional reactivity and can affect perception of reality and recall.

(S.A.II 319.)

> The SJC wrote:

> [A] defense expert's proffered testimony only acknowledged that Perez's mental health struggles "had the potential to and may have interfered with Mr. Perez's abilities to accurately perceive or recollect the [shooting]." Trial counsel argued this point specifically during closing, stating that Perez's diagnoses "are difficult illnesses and they may impact his ability to see and conceptualize what was actually happening."

*Ayala*, 112 N.E.3d at 256 (second alteration in original). The jury, however, was correctly informed that closing arguments were not evidence, and obviously defense counsel was not a qualified psychological expert. Defense counsel's generalized statement about Mr. Perez's "difficult illnesses" did not come close to putting the contents of the missing psychological records before the jury or obviating the need for expert testimony. *See Showers v. Beard*, 635 F.3d 625, 633–34 (3d Cir. 2011) (state court unreasonably applied *Strickland* in finding trial counsel's "closing argument sufficiently exploited gaps in the Commonwealth's evidence[,]" eliminating need for expert testimony). To make matters even worse for Petitioner, the ADA argued in closing that it was Mr. Perez's military background—without acknowledging or apparently even knowing the extent of Mr. Perez's military-related mental health issues—which made his identification of Petitioner more reliable.

The SJC's finding that "it is unlikely that trial counsel would have used the information in the missing records to further attack Perez's ability to perceive the shooter due to his PTSD diagnosis even if counsel had them" is fundamentally flawed and does not support its factual finding as to the value of the psychological records. *Ayala*, 112 N.E.3d at 255 n.21. The SJC credited defense counsel's testimony at the evidentiary hearing on Petitioner's motion for a new trial, "that, at the time of the trial, he believed it would have been a poor tactical choice to 'attack' Perez in front of the jury, given that Perez was a veteran suffering from [PTSD]." *Id.* The SJC did not recognize the fact that trial counsel made this statement without any knowledge of the actual contents of the psychological and psychiatric records. *See Wiggins*, 539 U.S. at 536 (noting defense counsel were unable to make "a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable" in its limitation); *Koon v. Cain*, 277 F. App'x 381, 386 (5th Cir. 2008) (per curiam) ("[W]e recognize the distinction between strategic judgment calls and plain omissions[.]"). In fact, the psychological records bolstered one of defense counsel's chosen strategies of characterizing Mr. Perez as an "honest but mistaken" witness. Had defense counsel had the resource of hundreds of psychological records supporting his theory, he could have used them to explore the effect of Mr. Perez's PTSD symptoms on his percipient abilities and opened a fruitful area for expert testimony consistent with defense counsel's statement that he would not "attack" a veteran witness with PTSD. Given the parallels between the two shootings and the interconnectedness of both events in Mr. Perez's mental health treatment notes, it was unreasonable for the SJC to conclude defense counsel would not have used the records to pursue the very strategy he had selected—honest but mistaken identification.

Having found the state court's decision, by clear and convincing evidence, was based on an unreasonable determination of the facts under § 2254(d)(2), this court need not analyze whether the state court's decision also involved an unreasonable application of federal law under § 2254(d)(1). *See Porter*, 35 F.4th at 77 ("[T]he state court decision—depending on how it is read—either unreasonably

applies *Batson*'s second step or is premised on an unreasonable determination of the facts. And there is no need to identify which of these roads the state court traveled because both of them lead to the same destination. Either way, the state supreme court's decision is not entitled to deference under AEDPA."). The court does so, however, because of the interconnectedness of both paths to habeas relief presented in this case. *See Wiggins*, 539 U.S. at 528 (holding state court's "partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision").

2. Unreasonable application of law

Habeas relief under § 2254(d)(1) is warranted only if "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair[-]minded disagreement." *Richter*, 562 U.S. at 103. As discussed *supra*, the unreasonable factual findings supporting the SJC's *Strickland* analysis have direct bearing on the reasonableness of the SJC's application of law as governed by § 2254(d)(1).

> If the petitioner can show that the state court determined the underlying factual issue against the clear and convincing weight of the evidence, the petitioner has not only established that the court committed error in reaching a decision based on that faulty factual premise, but has also gone a long way towards proving that it committed unreasonable error. A state court decision that rests upon a determination of fact that lies against the clear weight of the evidence is, by definition, a decision so inadequately supported by the record as to be arbitrary and therefore objectively unreasonable.

*Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003) (internal quotation marks omitted); *id.* at 705 (holding state court's adjudication "unreasonable whether evaluated under the strictures of § 2254(d)(1) or § 2254(d)(2) and (e)(1)"); *see also Wiggins*, 539 U.S. at 528 (holding state court's "partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision"); *Hall v. Dir. of Corr.*, 343 F.3d 976, 983 (9th Cir. 2003) (per curiam) (holding state court's due process analysis unreasonable where court "proceeded from an incorrect premise"); Brian R. Means, Fed. Habeas Manual § 3:66 (May 2022 update) (collecting cases).

Bearing in mind the deference owed to the state court's adjudication, this court nonetheless holds the SJC's determination of the prejudice prong of *Strickland* as to the omitted psychological records was an unreasonable application of Supreme Court law under § 2254(d)(1). Petitioner has met his burden of showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

In determining prejudice, the court must consider "the totality of the evidence before the judge or jury." *Id.* at 695. A case in which the "verdict or conclusion [is] only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696. There is no dispute that Mr. Perez's identification of Petitioner was critical to the Commonwealth's case. *See Hughes*, 7 F.4th at 392 (holding "no fair[-]minded jurist could conclude" no prejudice arose from trial counsel's failure to obtain and introduce impeachment testimony for state's key witness); *York*, 736 F. App'x at 630 (applying AEDPA deference and finding prejudice where trial counsel did not obtain cell phone records "discrediting" state's key witness). "Had counsel located and introduced them, the [missing] records would have 'alter[ed] the entire evidentiary picture' before the jury, resulting in 'a reasonable probability that . . . at least one juror would have harbored a reasonable doubt' as to [defendant's] guilt." *York*, 736 F. App'x at 630 (alterations in original; internal citations omitted). The other evidence presented linking Petitioner to the shooting was testimony about his presence at the party, his refusal to be searched by the bouncer, his threat to "light th[e] place up" (or, as another witness testified, "shut the party down"), and his kicking in the front door, leaving a shoeprint. There was also testimony from another witness that Petitioner had left the scene before the shooting and it was not his car that sped away from the scene. *Cf. York*, 736 F. App'x at 632 ("The state's case rested on [one witness's] testimony; the evidence that trial counsel failed to locate and introduce would have undone that testimony. While there was other testimony in the record

supporting [defendant's] involvement, all of it was either equivocal or its credibility or reliability was subject to significant challenge. Under those circumstances, no fair[-]minded jurist could fail to acknowledge at least a reasonable probability of a different outcome." (internal quotation marks omitted)); *see also Gersten*, 426 F.3d at 611 (applying § 2254(d)(1) and finding prejudice where trial counsel failed to review records undermining credibility of witness forming "prosecution's entire case").

Without the psychological records, defense counsel had no grounds to effectively argue his motion for psychological expert testimony, which the trial court denied as being without "foundation," seeing "[n]o evidence in the medical records" that Mr. Perez's mental illnesses affected his percipient abilities or memory. (R.A. 16-16 at 55, 64.) The trial court's decisions regarding Mr. Perez's competency, comments on percipient ability, and the defendant's motion for expert testimony cannot be untangled from defense counsel's error in failing to pursue the complete and accurate psychological records. Moreover, defense counsel's "honest but mistaken" strategy was undermined because the limited 38-pages of non-psychological medical records, carefully reviewed by the trial court, appeared to bolster Mr. Perez's competency and reliability by the very absence of psychiatric and psychological details.

Absent Mr. Perez's identification of Petitioner as the shooter, Petitioner perhaps would have been of some level of investigative interest, but only one more attendee at an after-hours house party. Ms. Frazier testified Petitioner had completely left the scene before the shooting. And Mr. Perez testified he identified Petitioner solely on seeing Petitioner's face and he "d[idn't] exactly recall" what Petitioner was wearing on the night of the shooting. It was unreasonable for the SJC to conclude the missing psychological records—which showed Mr. Perez's PTSD symptoms, triggers, and the factual similarities between Mr. Perez's trauma and Mr. Ramkissoon's shooting—did not raise the "reasonable probability" that at least one juror would have harbored reasonable doubt as to Mr. Perez's

identification of Petitioner as the shooter and that they did not support trial counsel's theory of Mr. Perez's "honest but mistaken identification." *See Strickland*, 466 U.S. at 694. The trial court, without any of the highly relevant details of Mr. Perez's psychological records, foreshadowed the significance of those facts to evaluating Mr. Perez's percipient witness abilities:

> The record respecting his military duties is silent with the exception of the fact that it[] . . . simply say[s] "not disclosed" or "classified," I think was the word that was used.[15]

> So I don't know how all that plays in terms of relevance to what we need to determine, and that is, one, is he competent to express to this jury the percipient facets of his mind that he was able to use in making observations, allegedly, that Mr. Ayala is the person who shot that gun.

(R.A. 16-16 at 10.)

It was equally unreasonable under § 2254(d)(1) for the SJC to conclude Petitioner was not prejudiced by the lack of psychological expert testimony because defense counsel's statement during closing—"[those diagnoses] are difficult illnesses and they may impact [Mr. Perez's] ability to see and conceptualize what was actually happening"—was an adequate substitute for expert testimony interpreting the missing records. *Ayala*, 112 N.E.3d at 256. The trial court based its decision to deny expert testimony, in part, on its mistaken belief that the 38-page Veteran's Hospital file represented Mr. Perez's complete psychological and psychiatric file. The trial court stated: "[R]hinosinusitis that [Mr. Perez] had . . . might have affected his abilities more than bipolar. He might have blurred vision. . . . That's more prevalent on these records, more salient than bipolar disease." (R.A. 16-16 at 61–62.) The trial court found "[n]o evidence in the medical records or anything else" indicating Mr. Perez's percipient abilities were affected by his PTSD symptoms because none of the records containing Mr. Perez's mental health progress notes and psychiatric hospitalization were in trial counsel's or the

---

[15] The trial court's reference to "classified" military service comes from Mr. Perez's own characterization of his military service to his general practitioner during a primary care appointment. (S.A.II 42.)

court's possession. (R.A. 16-16 at 64.) Because defense counsel provided no "foundation" connecting Mr. Perez's mental illnesses and his abilities to perceive and recall the shooting, the trial court denied Petitioner's motion for psychiatric expert testimony that, had it been introduced, could reasonably be expected to introduce reasonable doubt into the jurors' minds as to Mr. Perez's credibility and competency. *See Hughes*, 7 F.4th at 392; *York*, 736 F. App'x at 632. It was unreasonable for the SJC to conclude otherwise. *See Hughes*, 7 F.4th at 392 (affirming grant of writ and stating, "AEDPA sets a high bar but not an insurmountable one."). As the trial court noted, psychological symptoms may impact a witness's immediate ability to perceive, recall, and then accurately describe a particular event. (R.A. 16-16 at 66–67.) In this case, the issue is particularly important given the factual similarity between Mr. Ramkissoon's shooting and the genesis of Mr. Perez's post-traumatic stress disorder as well as his interconnected memories of the two events.

Having concluded the state court's decision as to ineffective assistance of counsel is not entitled to AEDPA deference, this court must determine whether the writ shall issue. "A habeas petitioner ultimately must show that he 'is in custody in violation of the Constitution or laws or treaties of the United States.'" *Porter*, 35 F.4th at 82 (quoting § 2254(a)). For the reasons discussed at length above, this court holds Petitioner has shown he was denied effective assistance of counsel under the Sixth Amendment "sufficient to undermine confidence in the outcome" of his trial. *See Strickland*, 466 U.S. at 694.

## V.  SUFFICIENCY OF THE EVIDENCE

Having decided in Petitioner's favor on his ineffective assistance claim, this court must address Petitioner's argument as to the sufficiency of the evidence in order to determine the appropriate relief. *See Burks*, 437 U.S. at 18 (holding reversal of conviction for insufficiency of evidence is tantamount to acquittal and precludes retrial); *see also* 2 Fed. Habeas Corpus Prac. & Proc. § 33.3 (2021) (addressing differing forms of relief and collecting cases).

Under *Jackson v. Virginia*, 443 U.S. 307 (1979), this court asks "[w]hether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original). *Jackson* "also unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (quoting *Jackson*, 443 U.S. at 326).

The SJC analyzed Petitioner's sufficiency claim using a state analog to *Jackson. See Ayala*, 112 N.E.3d at 244–46 (applying *Commonwealth v. Latimore*, 378 Mass. 671, 677–78 (1979)). The SJC wrote:

> Although there was no evidence whether the specific street light near where the shooter was standing was on at the time of the shooting, a juror could reasonably have inferred that if the street lights in the area were on at 4:30 A.M., they would have also been on at the time of the shooting earlier in the morning. Even if an ordinary, rational juror is unfamiliar with muzzle flashes, they are undoubtedly familiar with the illuminating capability of street lights. This common knowledge would have allowed a rational juror to conclude that Perez had an adequate opportunity to identify the defendant as the shooter.

*Ayala*, 112 N.E.3d at 245 (footnote omitted).

It is important to emphasize that the focus of this court's review as to Petitioner's ineffective assistance claim is what evidence was *not* presented at trial, whereas this court's review as to Petitioner's insufficiency claim is based only upon the evidence presented at trial. On habeas review, this court cannot find unreasonable the SJC's conclusion that "*any* rational juror," drawing all inferences in the prosecution's favor, could have found that the evidence presented was sufficient to establish that Petitioner was the shooter. *See Linton v. Saba*, 812 F.3d 112, 123 (1st Cir. 2016) (applying *Jackson* standard to sufficiency claim).[16] The court therefore denies Petitioner's sufficiency of the evidence claim under § 2254(d).

---

[16] The court notes its *Jackson* analysis is not inconsistent with its conclusion the SJC unreasonably applied *Strickland*'s prejudice prong. While *Jackson* asks whether "*any* rational trier of fact could have

## VI.  CONCLUSION

Habeas relief is a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *See Richter*, 562 U.S. at 102–103 (quoting *Jackson*, 443 U.S. at 332 n.5 (Stevens, J., concurring in judgment) (internal quotation marks omitted)). Finding such "extreme malfunction[]" in the present case, this court is compelled to issue the writ. *Id.*

For the reasons set forth above, Petitioner is entitled to relief on his claim for ineffective assistance of counsel on the basis of trial counsel's failure to obtain the mental health records of the Commonwealth's sole percipient witness. The court denies relief on Petitioner's claim as to the sufficiency of the evidence and declines to reach his remaining claims. Mr. Ayala's Amended Petition for Writ of Habeas Corpus by a Person in State Custody (Dkt. Nos. 1, 23) is conditionally GRANTED. The clerk is directed to enter judgment for Petitioner. The case is remanded to the state Superior Court to retry Petitioner within 120 days or release him from custody.

It is So Ordered.

  /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge

---

found the essential elements of the crime beyond a reasonable doubt," *Strickland*'s prejudice prong asks whether, but for trial counsel's errors, there is a reasonable probability of a different outcome, *i.e.*, that one juror would have decided differently. *Compare* 443 U.S. at 319, *with* 466 U.S. at 694. The requirement of jury unanimity means a defendant may logically both lose an insufficiency claim (based on any one juror's supported guilty verdict) and win an ineffective assistance claim (based on the probability that any other one juror might have cast a not guilty vote). Moreover, Petitioner's sufficiency claim is necessarily limited to the evidence introduced at trial, whereas his ineffective assistance claim requires the court to consider the impact of the missing records, which the jury would have had but for trial counsel's unprofessional error.